HOPKINS, J.T.C.
This is a direct appeal to the Tax Court challenging the assessments for 12 tax lots in the taxing district of Bloomfield for tax year 1982. Westinghouse Electric Corporation (taxpayer) alleges that the total value of the tax lots, including improvements, is $3,050,000 and that upon application of the provisions of chapter 123 of the Laws of 1973, as amended, the assessment should be reduced from $3,285,900 to $1,555,500.
The property involved is an industrial complex which, on the assessment date, was owned and occupied in its entirety by Westinghouse Electric Corporation—Lamp Division (Lamp Division). As such, the site contains an office building, which was the national headquarters for that division, as well as manufacturing and warehousing facilities wherein components of the *95 various products manufactured by the Lamp Division and the finished products were produced and stored.
Shortly after the assessment date, the property was leased to North American Phillips Corporation with an option to purchase when that company acquired all of the operating assets of the Lamp Division.
The 14.895-acre complex is improved with 11 main structures, including a powerhouse, encompassing 1,013,811 square feet. Erected between 1905 and 1951, the buildings range from one story to five stories in height and are detailed as follows:
1. Building No. 1A, IB: A five-story and basement reinforced concrete building erected between 1906 and 1917 containing approximately 93,200 square feet. Approximately 61,-700 square feet are office area, 17,500 square feet are utilized for manufacturing and 14,000 square feet are used for warehousing and storage. It has central air conditioning.
2. Building No. 2A, 2B: A three-story reinforced concrete building erected between 1907 and 1920 containing approximately 170,249 square feet. Approximately 20,000 square feet are office space, 130,400 square feet are used for manufacturing and 19,849 square feet are used for warehousing and storage.
3. Building No. 3: A four-story reinforced concrete building erected between 1906 and 1920 containing approximately 186,-250 square feet. Approximately 14,200 square feet are used for office space, 76,500 square feet are used for manufacturing and 95,550 square feet are used for warehousing and storage.
4. Building No. 4A-B-C: A four-story reinforced concrete building erected between 1915 and 1920 containing approximately 137,328 square feet. Approximately 68,000 square feet are office space, 60,000 square feet are manufacturing space and 9,328 square feet are warehousing and storage facilities.
5. Building No. 5A-B-C: A four-story reinforced concrete building erected in 1915 containing approximately 83,200 square feet. Approximately 9,500 square feet are office space, 61,200 *96 square feet are used for manufacturing and 12,500 square feet are used for warehousing and storage.
6. Building No. 6: A one-story poured concrete building erected around 1912 containing approximately 29,405 square feet of manufacturing space.
7. Building No. 7: A five-story and basement reinforced concrete building erected between 1925 and 1929 containing approximately 82,824 square feet. It has central air conditioning and is utilized entirely as office, research and laboratory space.
8. Building No. 8: A five-story reinforced concrete building erected in 1930 containing approximately 149,277 square feet. Approximately 15,400 square feet are office space, 119,400 square feet are manufacturing space and 14,477 square feet are warehousing and storage space.
9. Building No. 9 and 10A: A one-story masonry building erected in 1925 with additions in 1951, containing approximately 19,830 square feet.
10. Powerhouse: A one-story reinforced concrete building erected in 1906 with additions in 1911 and 1927. It has 10,307 square feet and contains two boilers which are either oil or gas fired.
11. Garage: 7,163 square feet used for vehicular storage.
The complex contains a large cafeteria, an indoor recreational area and an auditorium. All public utilities serve the site, including water, sewerage, gas, electric and rail. In addition to public water, there are three private wells which have a total capacity of 188 gallons a minute. Further, there is a facility providing additional sewerage by a neutralizing system which treats excess acid and molybdenum used in processing.
The industrial complex was constructed by taxpayer for its own use and occupancy. Since it is a multistory facility, it requires conveyers and elevators for its production process. In addition, some of the buildings are connected by bridges.
*97 The plant has a 23,000 volt electrical service. All buildings are fully sprinklered and generally have steel factory sash or glass block windows. Buildings 1 and 7 had modern windows installed within the past several years. Various buildings throughout the complex show the effects of time in that concrete sections have broken off. However, the overall condition of the buildings is considered average.
Bloomfield is a stable community with a large residential population and gradually diminishing industrial properties. The plant, as presently constructed, fails to meet a number of the zoning requirements of the Township of Bloomfield. However, those deficiencies are recognized as legal nonconforming uses.
Taxpayer’s expert, in concluding a total value of $3,050,000, placed primary reliance on the market approach and supported the value by the capitalization of income approach. He determined that the cost approach was inappropriate due to the age of the complex and the fact that there was substantial functional obsolescence since current manufacturing and warehousing facilities would be built on a one- or two-story basis as compared with the multistory structures under review. Township’s expert utilized both the cost approach and the capitalization of income approach to conclude a value which sustained the assessment.
It is axiomatic that the highest and best use of real estate is the basis for its value. The American Institute of Real Estate Appraisers, The Appraisal of Real Estate, (8 ed. 1983), defines “highest and best use” as follows:
Highest and best use is a basic premise of value. As with value, highest and best use is not an absolute fact; it reflects an appraiser’s opinion of the best use of a property based on an analysis of prevailing market conditions. Highest and best use is defined as:

The reasonable and probable use that supports the highest present value, as defined,, as of the effective date of the appraisal.

Alternately:

The use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, that results in highest land value.

*98 Because the use of land can be limited by the presence of improvements, highest and best use is determined for (1) the land or site as though vacant and available to be put to its highest and best use; and (2) the property as improved, [at 28]
As previously noted, the subject is a large industrial complex which has been utilized in manufacturing components for the products of the Lamp Division for over 60 years. Its structures were built at various times and were all directed toward that manufacturing process as well as housing the Lamp Division headquarters. Taxpayer’s expert, in his approach to value, concluded that the highest and best use of the subject was a continuation of its present use, or alternatively, as a light manufacturing, multitenanted facility with warehousing, distribution and related office space. Township’s expert testified that the subject was special purpose property and its highest and best use was a continuation of its present use as a single user industrial facility. In concluding that the subject was special purpose property, he relied upon the definition that special purpose buildings are those with physical characteristics or facilities suitable to a restricted range of industrial processes. See Kinnard, Messner and Boyce, Industrial Real Estate, (3 ed. 1979), at 17. That treatise divided industrial buildings into three categories, namely, general purpose, special purpose and single purpose. Under its definition, the subject property would be special purpose property.
While the subject property, under the definition propounded by Industrial Real Estate, falls within the special purpose category, The Appraisal of Real Estate, supra, reads as follows:
Special Problems in Defining Value. When a property being appraised is of a type not commonly exchanged or rented, it may be difficult to determine whether a market or a use value estimate is called for. Such properties, called limited market properties, can cause special problems for the appraiser. A limited market property is a property for iphieh, at a particular time, there are relatively few potential buyers. Large manufacturing properties, for example, typically appeal to relatively few potential purchasers.
Many limited market properties have structures with unique physical designs, special construction materials, or layouts that result in a highly restricted level of utility—that being the use for which they were originally built. These properties usually have limited conversion potential. Consequently, such prop *99 erties are often called special purpose or special design properties. Examples of such properties include churches, museums, schools, public buildings and clubhouses, [at 36-37]
Under the definition contained in The Appraisal of Real Estate, the subject complex is a limited market property in that it would appeal to relatively few potential purchasers as a manufacturing complex. Depending upon which treatise is used, the property can be considered either special purpose or limited market. I shall accept the term limited market as defined in The Appraisal of Real Estate. Accordingly, I find that the highest and best use of the subject property is its continued use as an industrial complex for the manufacture of its present products. This conclusion is corroborated by the subsequent sale of the Lamp Division by taxpayer to North American Phillips Corporation and its continued use of the subject property as the headquarters and manufacturing center for that operation.
As previously noted, taxpayer’s expert concluded that the highest and best use of the subject was its continued use for the present manufacturing process or, alternatively, as a multitenanted facility for light manufacturing. However, much of his appraisal report was directed toward the diminishing number of industrial complexes in northern New Jersey, with emphasis on those that had been abandoned for that purpose and were presently being used as multitenanted industrial facilities. Valuing an industrial complex, presently in use as such, by such process was criticized in Simmons Co. v. Linden, 190 N.J.Super. 448, 451, 464 A.2d 300 (App.Div.1983). More recently, in CPC Int'l., Inc. v. Bor. of Englewood Cliffs, 193 N.J.Super. 261, 473 A.2d 548 (App.Div.1984), the court reviewed the valuation of a taxpayer’s international corporate headquarters. In rejecting the functional obsolescence allowance for additions which were installed to enhance the prestige of the headquarters’ office, which the Tax Court found were not such as to increase the property’s resale value, the court stated that such adjustment overlooked two governing propositions in the valuation of property for local property tax purposes. It there stated:
*100 ... The first is that the sale contemplated as the criterion of market value is a “hypothetical sale; hence, the would-be buyers are hypothetical buyers, not actual and existing purchasers.” United New Jersey, etc., Co. v. State Board etc., 100 N.J.L. 131, 135 [125 A. 335] (E. & A. 1924). From the context in which it was made we can only understand this reference to a hypothetical buyer to contemplate one whose requirements are reasonably accomodated by the property in question.
The second governing proposition bears on the intent and purpose of the taxpayer. Its substance is that no reduction from taxable value will be allowed for special purpose characteristics where these were built into the structure by the taxpayer without regard to the recoverability of their costs and the question of their marketable value is not raised by any realistic suggestion that the property is about to be offered for sale, [at 268-294, 473 A.2d 548]
The above principles require recognition that the number of elevators, the location of the various manufacturing facilities and headquarters offices, the relationship of office space to manufacturing space, as well as the cafeteria and auditorium, should be considered as pointing toward the continued use of this property as a division headquarters for a manufacturer similar to the Lamp Division. Accepting those principles, it is necessary to disregard many attributes of the subject property which taxpayer’s expert used to diminish its value, i.e., the lack of adequate elevators, the alleged uneconomical multistory buildings and the narrow roads between the buildings, since those shortcomings would relate to the use of the subject property as a multitenanted industrial facility.
In utilizing the market approach, taxpayer’s expert analyzed five sales which occurred during the period of April 1977 through November 1981. The first sale, chronologically, was the Lionel Toy Corporation facility in Hillside Township in April 1977. That facility contained 568,167 square feet of building area on 18.5 acres and sold for $4.40 a square foot. The second sale was the former General Electric plant in Bloomfield. That plant had once been a single-user facility but was a multitenanted facility at time of sale. It had a building area of 690,000 square feet on 13.5 acres and sold for $3.48 a square foot in
*101 October 1978. The third sale, in December 1978, was by American Can Corporation of Jersey City, which had also abandoned its building as a single-user facility. It had a building area of 1,180,000 square feet on 9.7 acres and sold for $1.27 a square foot. The fourth sale was a sale with a leaseback of 27% of the building by Uniroyal. The facility was located in New Haven County, Connecticut. It had a building area of 1,300,000 square feet on 16.5 acres and sold for $1.92 a square foot in March 1979. The fifth sale was by Colt Industrial Operating Corporation in Elizabeth. At the time of sale in November 1981, the facility was in the process of being vacated. It had a building area of 986,788 square feet on 15.38 acres and sold for $2.23 a square foot. After considering the five sales, taxpayer’s expert adjusted them upward and downward for time, office space, size, first floor space, ceiling height, land-to-building ratio and quality and condition at time of sale. In so doing, he concluded that the subject property had a value of $3.00 a square foot, or $3,050,000, as of the assessment date, under the market approach.
If the subject property had been converted to a multitenanted facility and was being valued on that basis, the first three sales, as well as the fifth sale, would have some merit, with appropriate adjustments. The fourth sale, by Uniroyal, which involved a leaseback of 27% of the building, required a more detailed explanation than that given by taxpayer’s expert. However, the subject property is to be valued as a single-user industrial complex. All five of the alleged comparable sales were properties that had been abandoned as single-user facilities and, accordingly, did not reflect the single-user industrial complex market.
In concluding a value predicated upon the capitalization of income approach, taxpayer’s expert utilized six comparable rentals to conclude that the subject property would rent at $1.25 a square foot, with the landlord responsible for management, fire insurance and structural maintenance costs.
*102 Taxpayer’s six comparable rentals actually comprised four distinct properties. The first was the former Singer plant in Elizabeth which has a total area of 1,510,000 square feet in buildings ranging from one to eight stories in height. The rental of $1.15 a square foot was computed by utilizing leases, many of which had expired prior to the assessment date. The fact that his schedule reflected the rent roll as of October 1, 1979, two years prior to the assessment date, indicates that it was utilized in an appraisal for a prior year and not made current for purposes of the subject case. His second comparable was the former Curtiss-Wright complex in Wood-Ridge and was based upon a multitenant listing of rentals. He used a lease schedule as of October 1, 1979 and October 1, 1980, which dates are prior to the subject assessment date of October 1, 1981. One of the leases utilized had expired in May 1981, and the schedule shows that several of the leases contained provisions for additional rents based upon increases in the Consumer Price Index (CPI) over the previous five years. Further, the average of the rents detailed in the Curtiss-Wright schedule amounts to $1.38 a square foot, while taxpayer’s expert’s master schedule lists the average square foot rent as $1.25.
While four additional leases were listed in taxpayer’s appraisal report, the expert testified that he did not consider them comparable because they were single-user leases of much smaller industrial space within large industrial complexes. Accordingly, he relied almost entirely upon the Singer and CurtissWright leases to conclude a rental value for the subject property of $1.25 a square foot with the landlord responsible for management, fire insurance and structural maintenance costs.
Township’s expert concluded his value by utilizing the cost approach as well as the capitalization of income approach. He utilized the cost approach because, in his opinion, this was special purpose property within the definition detailed in the Industrial Real Estate treatise and Simmons Company v. Linden, supra, in which the Appellate Division held that an *103 industrial complex used as a mattress manufacturing center was special purpose in nature and should be valued by the cost approach. In support of that proposition, the Appellate Division relied upon The Anaconda Company v. Perth Amboy, 157 N.J.Super. 42, 46, 384 A.2d 531 (App.Div.1978), certif. granted, 81 N.J. 55, 404 A.2d 1155 (1979) (“limited to the issue as to whether processing tanks and related machinery and equipment are or are not business personal property, taxable under N.J. S.A. 54.11A-1, et seq.’’). While the record in the Simmons case does not detail the specifics of the construction of the mattress manufacturing center, it is clear that the subject property in no manner represents special purpose property of the nature involved in the Anaconda case. In the Anaconda case, the property being valued was an electrolytic copper refinery. That was clearly special purpose property. I find that the subject industrial complex is a limited purpose facility which, with some modification, is capable of being utilized in the manufacture of other products. However, it is not to be valued as a multitenanted facility, but as the single-user facility that existed on the assessment date.
In using the cost approach, township’s expert concluded a replacement cost of $32,375,000 applicable to the buildings. From that cost he deducted 85% for depreciation and obsolescence. The large percentage attributable to such deduction is purely subjective. It cannot be verified and the lack of such verification makes the cost approach difficult to support. For this reason, the cost approach is avoided in anything but new and special purpose or unique buildings within the definition detailed in The Appraisal of Real Estate, supra. The more recent case of Shulton, Inc. v. Clifton, 7 N.J.Tax 220 (App.Div. 1984), aff’g per curiam 7 N.J.Tax 208 (Tax Ct.1983), stated as follows:
Defendant seeks to extract from Simmons more than it stands for. The case does not preclude use of the market value approach for large limited market property, so long as there is a reasonably active market therefor, and it does not compel the use of the cost approach to value. Dworman v. Tinton Falls, 1 N.J.Tax 445 (1980), aff’d o.b. 180 N.J.Super. 366, 3 N.J.Tax 1, 434 A.2d 1134 (App.Div.1981), certif. den. 88 N.J. 495, 443 A.2d 709 (1981). Nor does adapta *104 tion of the industrial complex to plaintiff’s particular needs mandate a finding that this is a special purpose property. Sunshine Biscuits v. Sayreville, 4 N.J.Tax 486 (1982) [at 223; emphasis added]
Township's expert utilized eight comparable rentals in concluding a value based upon the capitalization of income approach. All rentals involved tenants in a multitenanted industrial complex. The first two comparables showed rentals of $1.84 and $1.88 a square foot in the former Ballantine Brewery complex in Newark. They were for 105,000 and 213,057 square feet, respectively, in a complex that contained a total of 1,136,-000 square feet. The third rental was a lease of 104,000 square feet in an old eight-story mill type industrial building in Jersey City. That lease was entered into in February 1979 at $1.38 a square foot gross. The fourth lease was for 208,000 square feet of a building in the Hartz Mountain project in Harrison, at $2.40 a square foot net. There is no evidence as to the age or condition of the leased premises on the lease date. The fifth comparable was in the former Durant Motors plant in Elizabeth, which was erected in 1920. That lease was for 193,400 square feet at a gross rent of $1.02 a square foot commencing December 1, 1978. The sixth and seventh comparables were individual Singer Company leases in Elizabeth. The sixth comparable was at $1.37 a square foot gross for 165,000 square feet of first floor space commencing on June 1, 1979. It is noted that taxpayer’s expert’s schedule also detailed a lease of the same property but commencing at an earlier date and at a square foot rental of $1.27 a square foot gross. The seventh lease covered 221,000 square feet of first floor space at $1.31 a square foot gross. However, this lease was entered into in June 1978 and expired on May 31, 1979, over two years before the subject assessment date. The last comparable was located in Garfield and was a lease for 272,105 square feet at $1.30 a square foot gross. It commenced in 1973 with the tenant paying all increases in expenses over the base year with a maximum annual CPI adjustment of 4%.
Utilizing the above comparables, township’s expert concluded a rental value of $1.80 a square foot for the total complex *105 which he refined by breaking the complex into four categories. He valued the office area of 271,624 square feet at $2.50 a square foot; the manufacturing space, including the limited office space necessary for such process, of 514,235 square feet at $1.75 a square foot; the warehouse, storage and miscellaneous space of 214,589 square feet at $1.00 a square foot, and the garage space of 7,163 square feet at $3.00 a square foot. That segmentation produced an annual rental income, for valuation purposes, of $1,815,000 rounded.
There is no single doctrinaire approach to the valuation of real property. Samuel Hird & Sons, Inc. v. Garfield, 87 N.J.Super. 65, 72 (App.Div.1965); ITT Continental Baking Co. v. East Brunswick Tp., 1 N.J.Tax 244 (Tax Ct.1980). The choice of the predominant approach will depend upon the facts of each case and the reaction of the experts to those facts. Pennwalt Corp. v. Holmdel Tp., 4 N.J.Tax 51 (Tax Ct.1982). Further, the Tax Court not only has the right, but the duty to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question. Glen Wall Associates v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985).
Applying the above principles to the subject case, I find that the highest and best use of the subject property is a continuation of its present use. Further, due to the lack of appropriate industrial complex comparables, both from a rental and a sales approach, it is necessary to derive a value from that which is deemed most reliable and to apply such data to the subject property.
The market approach used by taxpayer’s expert is not acceptable since the comparables used were basically the sales of property moving out of the large industrial complex market. They were facilities which were abandoned as single-user complexes and were converted into multitenanted industrial operations, a different market. Further, the cost approach used by township’s expert, which requires an 85% deduction for depreciation and obsolescence, is so subjective as to make any conclu *106 sion based thereon highly suspect. A 5% addition to or subtraction from that figure, would result in a revised improvement value that would be one-third more or less than the conclusion reached.
Of the information supplied, I find that the lease data is the most reliable. Further, I find that such lease data can be considered within its context as being derived from multitenanted use of former single-user large industrial complexes. In so doing, there are pluses and minuses. In this respect, the market for such multitenanted industrial buildings is much greater and more competitive. However, the requirements of a large complex are often such that they are not easily met through comparable properties which can be purchased or leased. Here, there are attributes of the subject property which are not readily available in the market, i.e., the large percentage of office space, as well as the other peculiar attributes of the manufacturing complex.
The approach to be followed will be an analysis of the rental properties presented, with full recognition that they are in a different market. In so doing, the characteristics of the subject property, which must be considered in valuing it as a single-user industrial complex, will also be taken into consideration. The better approach is to break the industrial complex into its four component parts, as township’s expert did, namely, office buildings, manufacturing buildings, warehousing structures and garage space.
The starting point will be to ascertain the rent for manufacturing facilities using the comparables presented by both experts. In this respect, I find that the most reliable figures are those detailed by taxpayer’s expert in his analysis of the leases for the former Curtiss-Wright complex. It is noted that he, too, deemed that space most appropriate for valuation of the subject premises. Accordingly, those leases, as adjusted for time and rental additions, where applicable, indicate an average rental of $1.58 a square foot without an adjustment for location. The most comparable rentals which township’s expert used were the *107 two leases in the former Ballantine Brewery complex which averaged $1.86 a square foot. These leases are deemed to be in a more comparable location than the former Curtiss-Wright complex in Wood-Ridge. Accordingly, I find the economic rent for the manufacturing portion of the subject property to be $1.75 a square foot as of October 1, 1981. That coincides with the allocation given to the manufacturing space by township’s expert. I further find the office area of 271,624 square feet to have an economic rent of $2.50 a square foot, as testified to by township’s expert, which is a conservative rental for a centrally airconditioned office building. I also find that the $1.00 a square foot rent for 214,589 square feet of warehouse and miscellaneous space and the $3.00 a square foot for 7,163 square feet of garage space given by township’s expert is reflective of economic rent.
Accordingly, I find that the gross rental value of the subject property is $1,815,000 as of October 1, 1981, as proposed by township’s expert.
 In computing their values under the capitalization of income approach, both experts used a 10% vacancy factor and thus that percentage will be used. Taxpayer’s expert utilized a figure which was 5% of the effective gross income as a management expense and $70,967 for insurance, both of which are reasonable. His structural maintenance figure was premised on information furnished by taxpayer as a cost of the total maintenance of the plant. He then made his own adjustment to conclude a figure for maintenance which he deemed a landlord would normally assume. That deduction was $405,524 or more than 35% of effective gross income. I am not in agreement with his adjustment since it constitutes too large a percentage of effective gross income where the leases are net leases. Accordingly, I will accept, as a total deduction, a figure based on 25% of effective gross income as testified by township’s expert. That amount, which is $408,375, is sufficient to include management, insurance and structural maintenance.
*108 The 6% difference in the capitalization rate was attributable to the fact that taxpayer’s expert used a mortgage constant in his development of the mortgage equity band of investment. That constant should be reduced by the amount which would be attributable to equity buildup in order to compute an appropriate capitalization rate. So reduced, it is practically the same as Township’s expert’s 15% capitalization rate and, so, the 15% figure will be used. That 15% rate, together with the effective tax rate of 3.82% produces a total value of $6,509,700, rounded to $6,500,000.
Since the true value of the subject property produces an assessment which falls within the assessment protection range provided by chapter 123 of the Laws of 1973, as amended, the assessment for tax year 1982 is sustained.
The Clerk of the Tax Court will enter a judgment sustaining the assessment for tax year 1982.