PIZZUTO, J.T.C.
This local property tax appeal concerns property located at 31 Beaver Brook Road in the Borough of Lincoln Park, designated as Block 3, Lot 313.1 by the taxing district. For the tax year 1989 the subject property was assessed as follows:
[[Image here]]
Plaintiff, United Jersey Bank (UJB), as tenant required by lease to pay real estate taxes, appealed to the Morris County Board of Taxation, which affirmed the assessment. UJB then brought this appeal, maintaining that the assessment exceeds the true value of the property and is discriminatory. The average ratio of assessments to true value for the tax year at issue in this taxing district, as computed by the Director of the Division of Taxation under N.J.S.A. 54:l-35a et seq. (hereinafter chapter 123), is 50.81%. An assessment whose ratio to true value falls between the upper and lower limits of the common-level range established by chapter 123 may not be disturbed on appeal to the Tax Court. N.J.S.A. 54:51A-6. The upper and lower limits applicable here are 58.43% and 43.19%, respectively.
*553 The subject property is an irregularly-shaped tract measuring .818 acres.[1] The property does not front on any road. Rather, it fronts on land owned by the borough along the right-of-way of the abandoned Morris Canal, which separates the property from Beaver Brook Road. The borough has granted to the subject’s fee owner an easement for ingress and egress over this land and for the erection of signs. The easement was granted in 1972 and requires annual payment of a sum of at least $750, which is subject to upward adjustment every five years on the basis of increases in the consumer price index. Both parties agree that a substantial portion of the property lies in a designated flood hazard area. The tract is served by all the usual utilities.
The improvements consist of a branch bank building with a landscaped lawn, as well as a paved driveway and parking area with 22 parking spaces.
The one-story building is of frame construction with brick on block exterior walls. It is set upon a concrete slab foundation. The roof is flat, surfaced with tar and gravel, and surrounded by a decorative mansard. The building area is 2,532 square feet.
The building has a night depository and two drive-up banking lanes, one of which is served by a pneumatic tube system. A canopy covers part of the drive-up lanes. The interior of the building contains a lobby with an automated teller machine. There is a five-teller counter equipped with protective acrylic windows, a vault measuring approximately 10 feet by 20 feet, two coupon booths for customer use, a branch manager’s office, an employee kitchen and lavatories. The ceiling is ten feet high, of suspended acoustical tiles, with recessed fluorescent light fixtures and incandescent spot lighting. Wood double-hung insulated glass windows are set within stained wood *554 molding. Interior finish includes a wood wainscot and vinyl coverings over plasterboard walls, except in the employee lounge where walls are painted. Floor finishings consist of ceramic tile in appropriate areas, and good quality commercial grade carpet.
The property is located in the borough’s B-2 shopping center zone, which permits banking. Zoning requirements include one parking space for every 300 square feet (or portion thereof) of floor area, one-acre minimum lot size, and 150-feet minimum frontage. The property is nonconforming because of frontage and lot-size requirements.
I have concluded that this property should be valued exclusively by a capitalization of the income producible from its current use. The cost and sales comparison approaches, as employed by the appraisers, have not yielded reliable indications of value. The experts have, moreover, identified a sufficient number of bank branch leases to determine a market rental for the subject, while defendant’s contention of value in excess of that from the current use is not supported with an appropriate highest and best use analysis.
Both appraisers employed the cost approach. Plaintiff’s appraiser regarded it as a confirmation of value derived primarily from income capitalization, while defendant’s appraiser arrived at final value by correlating results of all three approaches. Both experts used Marshall and Swift cost data to calculate depreciated cost and arrived at similar figures for the value of improvements. They differed greatly, however, in their computation of land value.
Plaintiff has applied the average ratio determined under chapter 123 for the tax year 1989 (.5081) to a modified land assessment[2] of $40,900 for a land value of $80,500. Defendant *555 has derived a unit value of $9.50 a square foot from sales data for a total land value of $339,000.
The first point to note concerning the utility of the cost approach is that a suburban bank branch of the subject’s age, size, and layout should not be considered a special purpose property. Since adequate data from similar properties is available to value the subject on the basis of income, a cost analysis should be used, at most, supportively in this case. Cf. Gabrellian & Jessourian Associates v. Oakland, 11 N.J.Tax 810, 316 (Tax Ct.1991). In addition, the difficulties inherent in each expert’s calculation of land value warrant disregard of the cost approach, even for supportive use.
Plaintiff’s conversion of the land assessment to a land value by application of the average ratio claims support from Glen Wall Associates v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985). See also Parkway Village Apts. v. Cranford, 8 N.J.Tax 430, 436 (Tax Ct.1985). On the other hand, the recent decision in National Westminster Bank v. Brigantine, 11 N.J.Tax 502 (Tax Ct.1991) rejects this method on the authority of In re Appeal of Kents 2124 Atlantic Ave. Inc., 84 N.J. 21, 166 A.2d 763 (1961).
It is not necessary in this case to determine whether Glen Wall controls. If controlling, Glen Wall would require a conclusion that a plaintiff, offering not more than a cost-derived value for improvements and an assessment-derived land value, had sustained the burden of providing evidence sufficient to determine value. Plaintiff has, however, met this burden and provided superior evidence of aggregate value in its market-based income approach. The assessment-derived land value is therefore not necessary to overcome a lack of market data in order to sustain an evidentiary burden. A cost analysis incorporating this value is also not sufficient to support or qualify the actual market data presented in both experts’ income analyses.
*556 Defendant seeks to establish a land value of $9.50 a square foot from an analysis of vacant land sales. I do not, however, consider that the five sales presented reflect, even after adjustment, land values comparable to that of the subject.
Four of the sales are in the same taxing district, but none are in the same zone. Three of the four Lincoln Park sales are in the B-l business zone, where considerably more intensive development is permitted than in the B-2 zone, where the subject is located. The minimum lot size of 5000 square feet in the B-l zone is substantially smaller than the one-acre requirement of the B-2 zone. There is no minimum frontage requirement in the B-l zone. Also, maximum building coverage as a percentage of the lot area is substantially greater in the B-l zone (70%) than in the subject’s zone (40%). Given these differences, defendant’s appraiser’s adjustment of comparable values downward by 10% to account for zoning differences is unconvincing, and there is no basis in the record for a more appropriate adjustment. Moreover, evidence produced by plaintiff of leases of existing improvements at the address of one of these comparables, dated within 60 days of the sales date, puts seriously into question whether the property sold was vacant land.
The fourth Lincoln Park sale is on Main Street in the LB business zone, which also has different requirements from the subject’s zone. The fifth sale is in the Borough of Butler in a neighborhood defendant’s expert characterized as “considerably different” from the subject’s locality. Neither in themselves nor taken together with the three sales in the B-l zone do these sales afford a reliable basis for fixing the subject’s land value.
Defendant’s appraiser also employed a sales comparison analysis and offered as his only comparable a sale of a bank branch located in a different taxing district. Testimony concerning this sale was excluded at trial under R.8:6-l(b)(2) because the sale was not identified and disclosed to plaintiff as required by that rule. It does not therefore enter into the determination of value.
*557 Defendant contends, as part of his highest and best use analysis, that an excess land value must be recognized in the property. Excess land is “land beyond the normal needs of a particular use, as determined in the market.” American Institute of Real Estate Appraisers, The Appraisal of Real Estate (9 ed. 1987), at 290. If excess land is marketable independent of the lot’s primary use, or if the excess land contributes a development potential to the lot as a whole, its value should be ascertained and added to the value of the lot as currently used. Id. at 200-201.
Defendant’s appraiser calculated an excess land area of 15,-540 square feet. This figure was computed by applying the land-to-building ratio of the bank branch he had offered as a comparable sale (7.94:1) to the subject’s building area (2,532 square feet) and subtracting the result (20,104 square feet) from the subject’s lot size (35,644 square feet). The appraiser then applied the $9.50 a square foot unit value derived in his cost approach to 15,540 square feet to arrive at an excess land value of $147,600. He considered that this excess land value could be realized by erecting an additional story or two and by providing additional parking.
 Defendant’s excess land contention must be rejected. Initially, in the absence of a unit land value supported in the record, value for excess land cannot be quantified. In addition, defendant’s measurement of excess land depends upon a land-to-building ratio that rests on evidence excluded from consideration. Most important, however, the highest and best use analysis is unsound. It is based on a simple comparison of the property’s current use with maximum development permitted in the B-2 zone and fails to assess adequately the actual potential for further development.
For a finding of excess land to be warranted, highest and best use analysis must demonstrate that additional development is physically possible, legally permissible, and economically feasible as well as more productive. See Ford Motor Co. v. *558 Edison, 10 N.J.Tax 153, 161 (Tax Ct.1988), aff’d — N.J.Tax (App.Div.1990), certif. granted — N.J. -(1991).
There is no dispute that the subject property is not in conformity with the zoning requirement for minimum lot size and that it is, at least partly, within a delineated flood zone. Realization of any additional development potential therefore depends upon regulatory approval that cannot be assumed. Six Cherry Hill, Inc. v. Cherry Hill Tp., 7 N.J.Tax 120, 129 (Tax Ct.1984), aff’d 8 N.J.Tax 334 (App.Div.1986). Defendant has made no showing as to the likelihood of this approval. The physical adaptability of the structure to the additional story or stories suggested by defendant’s expert is not addressed. Moreover, it has not shown that any particular use to which the property might be put would be economically profitable. No analysis has been made either of costs of development and construction or the need for and potential return from any given kind of development.
Defendant’s argument amounts to little more than speculation that the property may accommodate more parking and some additional office space. In the absence of a persuasive development analysis, I conclude that defendant has not established excess land value and that the subject’s highest and best use is its present use.
This property must therefore be valued by a capitalization of the income producible from its current use as a branch banking facility.
The appraisers utilized different rentable building areas: plaintiff employed a 2400-square foot measurement recited on the property record card, while defendant performed his own measurement and calculated 2532 square feet. Plaintiff’s economic net rental value is $20 a square foot and defendant’s is $24. Both experts allow 5% of gross rent for vacancy loss and contingencies. Defendant allows 5% of resulting effective gross income for expenses, while plaintiff recognizes as expense only an annual easement fee of $776 to the municipality.
I accept defendant’s physical measurement, rather than the record description, as accurate. In addition, I consider $21 *559 a square foot to be the appropriate economic net rent. Plaintiff has identified seven bank branch leases and defendant has identified three. Two leases are common to both.[3] After adjustments considered appropriate by the appraisers, plaintiffs leases exhibit a range of $16.20 to $21.45 a square foot and defendant’s show a range of $20 to $26.44 a square foot. Plaintiff identified an additional transaction involving’ a lease by one bank to another of a fully equipped bank branch its appraiser considered comparable to the subject for $21 a square foot. Although this lease was not consummated because of the lessee’s inability to obtain branch approval from the New Jersey Banking Department, I consider it reflective of the market.
Since a net rent of $21 a square foot is within each appraiser’s range of comparables and is also reflected in a transaction between banks, I conclude that it is the appropriate net rent for valuation of the subject.
As to the remainder of the capitalization formula, I consider defendant’s expert’s analysis more persuasive. Plaintiff employs an overall capitalization rate[4] of 11% based on 75% *560 mortgage financing at liy2% amortized over 25 years and an equity dividend rate of 8%. Defendant’s overall rate is 10% based on 70% financing at 11% over 25 years and an equity dividend rate of 6%. Plaintiff’s value is $407,400 and defendant’s (without regard to excess land) is $548,400.
Defendant’s expert has allowed adequate provision for expenses and realistic financing terms. I also accept his conclusion as to a 6% equity dividend rate. The equity dividend rate, also known as a cash-on-cash rate or a cash flow rate, reflects the relationship between a single year’s pre-tax cash flow expectancy and the equity investment. The Appraisal of Real Estate, supra at 413. As such, it does not reflect the appreciation in value that the typical investor in commercial real estate of good quality seeks. The equity dividend rate for this kind of property will therefore often fall between short-term Treasury yields and non-speculative common stock yields, since the former represent a cash return on a fixed investment, while the latter reflect appreciation potential. Since defendant’s 6% rate is in this range, as shown by plaintiff’s collection of financial indicators, I consider it suitable.
Potential gross income on 2,532 square feet at $21 a square foot is $53,172. After allowance of 5% of this figure for contingencies and 5% of the resulting effective gross income for expenses, net operating income is $47,987.73. Capitalized at 10%, this figure produces a true value for the subject of $479,877.
The original assessment of $349,900 divided by true value yields a ratio (72.91%) higher than the chapter 123 upper limit (58.43%). Plaintiff has therefore proved entitlement to an *561 assessment equal to the true value determined above multiplied by the average ratio (50.81%), or $243,825, which is rounded to a final assessment figure of $243,800. Of this amount $40,900 is allocated to land to reflect application of the land factor employed by the taxing district to actual lot size and the balance of $202,900 to improvements.
The Clerk of the Tax Court is accordingly directed to enter judgment as follows:
[[Image here]]

 The property record card and the municipal tax map both indicate that the lot consists of 1.3 acres. However, the parties agree, and the taxpayer has provided a survey report that indicates, that the correct measurement is .818 acres.

 The modification entailed applying a unit value of $50,000 an acre reflected in the actual land assessment of $65,000 (based on 1.3 acres) to the .818-acre area acknowledged by both parties as accurate.

 The particulars of one of the common leases (Howard Boulevard, Mt. Arlington) are stated differently in the two appraisal reports. I do not consider this discrepancy to be significant to the economic rent determination. Even without this transaction, the leases produced by the parties support a rent of §21 a square foot.

 Both appraisers employ direct capitalization and compute an overall capitalization rate using a "band of investment" formula. Under this formula, the fraction of value considered financed by borrowing (expressed as a percentage ratio) is multiplied by a mortgage constant factor (the ratio of a single year’s mortgage payments under level- or fixed-payment amortization to the total mortgage amount). The fraction of value considered to be investor’s equity (again expressed as a percentage ratio) is multiplied by the equity dividend rate. The sum of the two products is the overall rate. The calculation of defendant’s overall rate, accepted in this decision, is as follows:
.70 x .1176 = .0823 (mortgage component)
.30 x .06 = .018 (equity component)
.1003 (overall rate, before rounding) *560 Since the subject property is occupied under a lease requiring the tenant to pay real estate taxes, the effective tax rate does not enter into the capitalization formula. See Humble Oil & Refining Co. v. Borough of Englewood Cliffs, 71 N.J. 401, 365 A.2d 929 (1976).