BIANCO, J.T.C.
This opinion constitutes the court’s determination after trial, concerning the challenge by plaintiff, 90 Riverdale, L.L.C. (“90 Riverdale”), to the 2009, 2010, and 2011 property tax assessments of its property located within the defendant municipality, Borough of Riverdale (“Borough”), commonly known as 90 Riverdale Road, and designated by the taxing district as Block 19, Lots 8.01 and 8.03 (“Subject Property”). For the reasons set forth herein, the court affirms 90 Riverdale’s 2009, 2010 and 2011 assessments.
The Subject Property consists of 4.73 acres[2], improved by a two story, light industrial warehouse/office building consisting of approximately 60,000 square feet as currently configured.[3] The Subject Property is zoned 1-1 (Industrial Park) which permits both industrial and office uses. The building contains slightly over 50 percent office space and just under 50 percent unfinished industrial space. The unfinished industrial space ceiling height is approximately twelve feet.[4]
For tax years 2009, 2010 and 2011, the Subject property was assessed at:
Lot 8.01 Lot 8.03 TOTAL
land $169,500 $752,000 $921,500
Improvements _$0 $3,588,600 S3.588.600
TOTAL $169,500 $4,340,600 S4,510,100
Both parties offered the testimony of professional real estate appraisers who were accepted by the court as experts without *333 objection; each expert prepared an appraisal report which was admitted in evidence also without objection.
According to 90 Riverdale’s expert, the Subject Property’s true value on the relevant valuation dates was:
[[Image here]]
The Borough's expert contends that the true value of the Subject Property on the relevant valuation dates was:
[[Image here]]
Both experts agreed that the current industrial/'office use of the Subject Property should continue. However, 90 Riverdale’s expert concluded that the 18,880 square foot “obsolete second [office] level” should be demolished which would reduce the overall office area from about 51 percent to just under 30 percent of the existing structure on the Subject Property.[5] By removing the second level, the clear ceiling height of the underlying unfinished industrial area would be increased from its current sub-standard height of 10 to 12 feet,[6] to approximately 24 feet. The expert opined that *334 the approximate cost of the demolition to be $500,000 but offered no supporting data for that number. While the Borough’s expert also concluded that the current industrial/office[7] uses should continue, he determined that the Subject Property contains sufficient excess land that could be further developed for office use.
90 Riverdale’s expert valued the Subject Property under the income capitalization and market approaches to value. Under the income approach, he deducted the 18,880 square feet from the gross building area, then applied a determined per square foot value for each tax year in dispute to arrive at declining true values from $1,510,000 (tax year 2009), to $1,240,000 (tax year 2010), to $1,070,000 (tax year 2001). Next, he employed the market approach to value on a per square foot basis, making various delineated adjustments [8] to his proposed comparable sales, including an adjustment for size where warranted (as compared to the reduced size of the gross building area of the Subject Property by 18,880 square feet, and not the actual size as currently configured). His resulting declining true values went from $2,850,000 (tax year 2009), to $2,450,000 (tax year 2010), to $2,090,000 (tax *335 year 2001). Despite the wide disparity between his conclusions of value under each approach to value (more than $1,000,000 for each tax year) the expert determined both approaches were relevant but relied more on his income approach.
The Borough’s expert concluded separate office and industrial values of the existing improvements on the Subject Property for the tax years at issue using only the income capitalization approach. He then concluded, through comparable land sales, an excess land value of $1,794,000[9] for each tax year based upon a determination that the Subject Property contains an excess 29,901 square foot buildable land area which can yield a 59,802 square foot office building. He added the excess land value to separately determined office and industrial values for each year, to arrive at overall values for each tax year in dispute.
90 Riverdale also offered the testimony of a Real Estate broker who testified as a fact witness as to the efforts made to sell/lease the Subject Property. In 2003, the original asking sales price was $4,750,000 followed by several price reductions down to $2,900,000 (April 2012). While it appears that offers to purchase were made which never came to fruition, it is unclear as to the timing of such offers, the terms of the anticipated sales, and the reasons why they never closed. While the Subject Property has been substantially vacant since 2003, a single tenant currently leases about 11,000 sq. ft. of the building on the Subject Property; both landlord and tenant have the right to terminate.[10]

*336
ANALYSIS

a. Burden of Proof
It is a “settled rale ... that there is a presumption that an assessment ... is correct and the burden of proof is on the taxpayer to show otherwise.” Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952); See L. Bamberger & Co. v. Div. of Tax Appeals, 1 N.J. 151, 159, 62 A.2d 389 (1948). However, “it is not sufficient for the taxpayer merely to introduce evidence: the presumption stands until sufficient competent evidence is adduced to prove a true valuation different from the assessment. Such evidence must be definite, positive and certain in quality and quantity to overcome the presumption.” Aetna Life Ins. Co., supra, 10 N.J. at 105, 89 A.2d 385 (1952) (citation omitted).
Moreover, “[i]n a non-revaluation year ... the Tax Court may increase the assessment even in the absence of a counterclaim ... if the proofs justify same.” Campbell Soup Co. v. City of Camden, 16 N.J.Tax 219, 226-27 (Tax 1996) (citing Passaic St. Realty Assoc., Inc. v. City of Garfield, 13 N.J.Tax 482, 484 (Tax 1994)). However, “[i]n a revaluation year, absent a counterclaim by the taxing district, the Tax Court may not increase the assessment above the original assessment ... without substantial evidence ... [demonstrating] the assessment ... is so far removed from true value and that the assessment methodology is arbitrary or capricious.” Campbell Soup Co., supra, 16 N.J.Tax at 226 (emphasis added); See F.M.C. Stores Co. v. Borough of Morris Plains, 100 N.J. 418, 431, 495 A.2d 1313 (1985); See also Short Hills Assoc./Taubman Co. v. Township of Millburn, 20 N.J.Tax 352, 357-58 (Tax 2002).
b. Valuation Methods
“New Jersey courts have held, consistent with established appraisal principles, that property can be valued according to three valuation methods: comparable sales, capitalization of income[,] and depreciated reproduction cost.” 43 New Jersey Practice, *337 State and Local Taxation, 7.3, at 101 (David E. Crabtree) (2nd ed. 2007)
However, in evaluating the valuation methodologies presented here, the court is not bound by the opinions of expert witnesses. See Wright v. Purepac Corp., 82 N.J.Super. 100, 111, 196 A.2d 695 (Cty.Ct.1963). “[A]n expert’s opinion is only as good as the data upon which the expert relied.” Greenblatt v. City of Englewood, 26 N.J.Tax 41, 54-55 (Tax 2010). See also Dworman v. Tinton Falls, 1 N.J.Tax 445, 458 (Tax 1980) (An expert’s opinion “depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard.”) (citation omitted). “An expert’s opinion may be adopted in whole or in part or completely rejected.” Atlantic City v. Atlantic County Bd. of Tax., 2 N.J.Tax 30, 43 (Tax 1980) (citation omitted). Although the court is required to apply its expertise in valuation matters, see Glen Wall Assoc, v. Township of Wall, 99 N.J. 265, 280, 491 A.2d 1247 (1985), it must be in conjunction with the data submitted by the parties. See Greenblatt, supra, 26 N.J.Tax at 56, emphasis added (finding that the court can “deduce[]” the value of the property at issue “only... when there is sufficient substantial and competent evidence in the record to support that determination”). See also Global Terminal & Container Services v. Jersey City, 15 N.J.Tax 698, 703 (App.Div.1996) (this court’s duty to “make an independent determination of value ... is not boundless, [and, therefore] [t]he court need not make such determination in the absence of sufficient compliant evidence”) (citations and internal quotations omitted).
i. The Income Capitalization a/k/a Income Approach to Value
Pursuant to the Income Approach, “gross income is first estimated then a reduction for vacancy and loss allowance is taken, to arrive at effective gross income, which is reduced for expenses. This exercise produces net operating income, which is then capitalized at a given rate to arrive at true value.” 43 New Jersey Practice, State and Local Taxation, supra, at 107; See also New *338 Jersey Real Property Appraisal Manual for New Jersey Assessors, Vol. I, at 1-119 to -120 (3rd ed.)
When sufficient data is available, capitalization rates are “[i]deally ... derived ... from transactions of similar competitive properties.” Glen Wall Assoc. supra, 99 N.J. at 279, 491 A.2d 1247. “Accepted techniques” for determining capitalization rates include using a “band of investment [with] mortgage and equity components____” The Appraisal of Real Estate, supra, at 501. “[W]hat is required is that reliable market data be furnished to the court as the basis for the expert’s opinion so that the court may evaluate the opinion.” Glen Wall Assoc., supra, 99 N.J. at 279-80, 491 A.2d 1247. The “probative value of an expert’s opinion depends entirely upon the facts and reasoning adduced in support of it.” Kearny Leasing Corp. v. Town of Kearny, 6 N.J.Tax 363, 376 (Tax 1984), aff'd o.b., 7 N.J.Tax 665 (App.Div. 1985), certif. denied, 102 N.J. 340, 508 A.2d 215 (1985) (citation omitted).[11] Stated otherwise, an “expert’s conclusion rises no higher than the data which provide the foundation.” City of West Orange v. Goldman, 2 N.J.Tax 582, 588 (Tax 1981) (citation omitted); See 43 New Jersey Practice, State and Local Taxation, supra, at 111 (“the determination of the appropriate [capitalization] rate depends upon the credible evidence and the persuasive powers of the experts”).

ii. The Market Approach to Value

“Evidence of comparable sales is effective in determining [the] value of property for property tax purposes only where there is substantial similarity between the properties” and the subject. Kearny Leasing Corp., supra, 6 N.J.Tax at 376 (citation omitted). However, “Comparability is [] vitiated when there is a vast *339 difference in size between the comparables and the subject.” 43 New Jersey Practice, State and Local Taxation, supra, at 103; See Thomas J. Lipton, Inc. v. Township of Raritan, 10 N.J.Tax 202, 208 (Tax 1988), aff'd, 11 N.J.Tax 100 (App.Div.1989) (finding sales comparison inappropriate when “comparables” were two and three times larger than the subject).
In fact, in Dresser Industries, Inc. v. Town of Harrison, 12 N.J.Tax 159, 166 (Tax 1991), the Tax Court rejected proffered sales as “not comparable by reason of size.” The court found the “usable square footage” of the subject property “to be 870,223”, whereas “the useable square footage in three of the expert’s comparables [were] only 140,000 and ... 124,600 square feet____” Id. at 166; See also Borough of Alpine v. Alpine Hills, Inc., 1 N.J.Tax 136, 141 (Tax 1980), aff'd o.b., 179 N.J.Super. 65, 2 N.J.Tax 391, 430 A.2d 641 (App.Div.1981).
c. Failure of Evidence

i. 90 Riverdale’s Evidence

While the court accepts as plausible 90 Riverdale’s premise that the building on the Subject Property contains an 18,880 sq. ft. obsolete second floor office area that impedes the ceiling height of the underlying unfinished industrial space to below market standards and would best be removed,[12] its expert falls short of the mark in providing a reliable opinion of value for each tax year in issue under both approaches to value he utilized.
(a) 90 Riverdale’s Income Approach
The reliability of 90 Riverdale’s expert’s conclusions of value under the income approach are dependent upon the court’s acceptance of his proffer that the demolition of the, in his words, “obsolete second [office] level” is necessary and that $500,000 is a reasonable cost of the demolition work. While it is clear to the court that the low ceiling height of the unfinished industrial space *340 (which was created by the addition of the second level) is substandard for a warehouse in today’s market place,[13] and that the removal of the second floor would substantially cure that obsolescence, the expert failed to substantiate how he arrived at the $500,000 figure — no data was included in his report; his testimony indicates that the amount was derived at solely through hearsay, without any independent corroboration.[14] Furthermore, the expert provided no convincing evidence that there was no market for the building as configured, or that the proposed demolition was the only way to make the building marketable.[15] Accordingly the coui’t is left without any reliable data with which to confirm or even recalculate the demolition costs, or to determine the necessity of the demolition.
This constitutes a significant flaw in the analysis of 90 River-dale’s expert as his entire income approach is predicated upon the removal of the second floor office area which would reduce the Subject Property’s nearly 60,000 sq. ft. building by 18,880 sq. ft. All his proposed comparable rentals,[16] and all of his calculations *341 under the income approach are premised upon the reduction of the building area to 40,656 sq. ft. which would reduce the percentage of office space to less than thirty percent, and significantly increase the clear ceiling height of the unfinished industrial area to 24 feet.
Without reliable data to substantiate the necessity or cost for the removal of the 18,880 sq. ft. second floor office area, the only viable way to value the Subject Property under the income approach would be as it is currently configured. To that end, 90 Riverdale’s expert gave the court virtually nothing to work with. The court can only invoke its own expertise in these matters when reliable data is presented; it is not the court’s role to act as expert for either party, or fill in the blanks when the evidence is lacking. See Glen Wall Assoc., supra, 99 N.J. at 279-80, 491 A.2d 1247; Global Terminal & Container Services, supra, 15 N.J.Tax at 703; Greenblatt, supra, 26 N.J.Tax at 54-55; Atlantic City, supra, 2 N.J.Tax at 43; Dworman, supra, 1 N.J.Tax at 458; Wright, supra, 82 N.J.Super. at 111, 196 A.2d 695.
(b) 90 Riverdale’s Market Approach
The market approach of 90 Riverdale’s expert is no more helpful to the court than his income approach. The market approach is also predicated on the removal of the 18,880 sq. ft. second floor office area and all the proposed comparable sales are compared and adjusted to the reduced size of the building on the Subject Property.[17] The expert somehow arrives at demolition costs of $160,000 for tax year 2009, and $150,000 for tax years 2010 and 2011, without explanation (or why the demolition cost is *342 $500,000 under the income approach but lower under the market approach).
Furthermore, the expert does not make clear what part of his “Physical/Functional Attributes” adjustments pertains to conditions other than clear ceiling height.[18] “Normally in a warehouse, manufacturing/industrial plant, high ceilings up to a certain height are desirable; at what height and to what extent high ceilings of the subject have a significant negative factor is not shown.” Congoleum Corp. v. Hamilton Tp., 7 N.J.Tax 436, 455 (Tax 1985).
The expert himself did not place much weight on his market approach, which yields values more than $1,000,000 less than his conclusions of value under the income approach for each tax year in issue. Moreover, the fact that all but one of the proposed comparable sales for all three tax years at issue, required more than (+ or -) 20 percent total adjustments renders their reliability tenuous. See generally, M.I. Holdings, Inc. v. Jersey City, 12 N.J.Tax 129, 137 (Tax 1991) (“The magnitude of these adjustments vitiates comparability.”); Venino v. Borough of Carlstadt, 1 N.J.Tax 172, 175 (Tax 1980) aff'd o.b. 4 N.J.Tax 528 (Tax 1981) (“Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties so as to admit of reasonable comparison.”); and Owens-Illinois Glass Co. v. Bridgeton, 8 N.J.Tax 495, 512 (Tax 1986) (“[the] extreme percentage of adjustment standing alone is sufficient to disqualify ... use [of a proposed comparable sale].”)
Still, 90 Riverdale’s expert found the market approach “relevant” and factored it in during the reconciliation process, further reducing his overall conclusions of value. The Tax Court has observed that
An appraiser relies more on professional experience, expertise, and judgment in reconciliation than in any other part of the valuation process. In reconciliation an *343 appraiser considers and evaluates varying value indications to arrive at a final value estimate. The appraiser weighs the relative significance, applicability, and defensibility of each value indication and relies most heavily on the approach that is most appropriate to the nature of the appraisal.
[Lenal Properties, Inc. v. Jersey City, 18 N.J.Tax 405 (Tax 1999), citing The Appraisal of Real Estate, 603 (11th ed. 1996).]
Furthermore,
The primary consideration in the reconciliation process is the relative reliability of the ... value indicators, especially when there is a wide disparity between the ... indicators. For this reason, the reconciliation process requires a thorough review of the complete appraisal process. The appraiser must review the reliability of the data, the logic and analysis applied to the data, and the resulting value indicators.
[Real Estate Appraisal (2006), p. 92] [19]
While appraisal experts clearly have great leeway in the reconciliation of values, the judicial process would be better served, and much in the way of credibility gained, if the experts would be more willing to proclaim when clearly warranted, that “the Emperor has no clothes.”[20]
Here, the court finds that 90 Riverdale has failed to meet its burden of proof.

ii. The Borough’s Evidence

The conclusions of the Borough’s expert provide little assistance to the court in the pending matter. However, since those conclusions, had they been accepted by the court, would have resulted in an increase in the assessment of the Subject Property under a Chapter 123 analysis, the merits of the Borough’s expert’s conclusions require some discussion. While the *344 Borough’s expert used only the income approach to value (which is most appropriate for the Subject Property), the court is not convinced that his conclusions of separate values for each of the office and industrial uses are justified.
In Levitz Furniture Corp. v. Paramus Borough, the subject property “consisted] of one building [divided between warehouse and retail space] utilized for one purpose — a furniture store which both experts viewed as its highest and best use.” 17 N.J.Tax 483, 491 (1998). The court determined that:
Taxpayer’s appraisal expert erroneously relies on Hull Junction Holding Corp. v. Princeton Borough, 16 N.J.Tax 68 (Tax 1996) as authority to value the warehouse area independently from the office/showroom area. The property in Hull Junction, is significantly different from the subject. That properly consisted of numerous buildings, including office, retail, apartment, and indoor parking garage, as well as rights to build additional residential units. Each use produced income separate and apart from each other. The subject property, however, consists of one building utilized for one purpose — a furniture store which both experts viewed as its highest and best use. The municipality’s expert witness recognized the interrelationship of the subject’s two areas and how they were utilized for one purpose — the sale of furniture. Thus, the subject property's warehouse area was not designed to compete with other warehouse space for separate income.
Ibid, (emphasis added).
Because the entirety of the building in Levitz was used for a singular purpose, the municipality’s expert contended, and the court agreed, that the more reliable appraisal method for the subject property was to establish market rent for the entire property improvement as retail, and then make adjustments for the excess warehouse area, and difference in construction and condition. Id. at 489-90. In addition, where the court found that comparable leases did not contain comparable ratios of warehouse space, the court adjusted the rental value downward by 30%. Id. at 492. See also Entenmann’s Inc. v. Totowa Borough, 18 N.J.Tax 540, 552-53 (Tax 2000) aff'd, 21 N.J.Tax 182 (App.Div. 2003) (where the court accepted, in part, valuing together noncompeting office space and industrial space in coming up with a figure for economic rent); but distinguish Westinghouse Elec. Corp. v. Bloomfield Tp., 9 N.J.Tax 92, 106 (Tax 1985), (where the tax court accepted four separate values for four different components of a single-tenant industrial complex to arrive at a single unitary value for the entire property because the subject property *345 in Westinghouse had a highest and best use as a single user industrial complex and consisted of multiple buddings). Id. at 95-99,106.[21]
In the present matters the Borough’s expert valued the office and industrial warehouse components of the Subject Property separately. The court finds however, that this is not consistent with the expert’s determination that there are no pure office buildings in the area of the Subject Property which suggests that the office use of the Subject Property is solely appurtenant to a primary industrial use.
In the court’s view valuing the individual components of the Subject Property separately resulted in significantly inflated values.
Next the Borough’s expert proffered an excess land theory which produced an additional value he added to his separate office and industrial values. The court is not convinced that any excess land value is justified. Effective cross examination raised significant doubt as to the expert’s knowledge of appropriate set-back requirements, as well as permissible land-to-building ratios. While the Borough’s expert indicated that there were no pure office buildings in the area of the Subject Property, he concluded that the highest and best use of the “excess land” is office (which is not only inconsistent with his highest and best use for the Subject Property overall, but is also unsupported by any analysis as to how he came to this conclusion). Furthermore, it appears that most of the required parking spaces required for the proposed new 59,802 sq. ft. office building would come from the existing parking for the existing structure on the Subject Property. The Borough’s expert failed to satisfactorily explain how this *346 would not create a parking deficiency for both structures, existing and proposed.
In United Jersey Bank-Peoples Trust of NJ v. Lincoln Park Borough, 11 N.J.Tax 549, 557 (Tax 1991), the court rejected as evidence of value for highest and best use of surplus land because it was “based on a simple comparison of the property’s current use with maximum development permitted [by the relevant zoning law] and fail[ed] to assess adequately the actual potential for further development.”
Here as in United Jersey, “Defendant’s argument amounts to little more than speculation that the property may accommodate more parking and some additional office space. In the absence of a persuasive development analysis, [the court may] conclude that defendant has not established excess land value ...” Id. at 558.

CONCLUSION

For the foregoing reasons, 90 Riverdale’s property tax assessments for tax years 2009, 2010 and 2011 are affirmed. The Tax Court Clerk/Administrator shall issue a judgment consistent with this opinion.

 Lot 8.01: 3.39 acres; Lot 8.03: 1.34 acres.

 59,536 square feet of "total constructed area" according to 90 Riverdale, but valued based upon 40,656 square feet claiming an 18,880 square foot "obsolete second level”; 61,000 square feet according to the Borough.

 The original building was constructed as a one story 18,880 sq. ft. warehouse around 1975. In the early 1980s, a 21,776 sq. ft., two-story office addition was constructed on the northerly end of the warehouse. Before 1990, to accommodate the needs of a tenant, an 1880 sq. ft. office area was constructed in the upper portion of the warehouse, with the lower portion also being converted to office. When the tenant vacated in 2003, the lower portion of the warehouse was gutted and left as unfinished industrial space.

 30,760 sq. ft. of existing office space = 51.6% of total area of 59,536 sq. ft. (including 28,776 sq. ft. of industrial warehouse space) according to the measurements of 90 Riverdale's expert. When the 18,880 sq. ft. of “obsolete second [office] level" space is demolished, that would reduce the total office area to 11,880 sq. ft. or 29.2% of the new total area of 40,656 sq. ft., according to the measurements of 90 Riverdale's expert. See John A. Simpson, MAI and Donald Sonneman, ASA, “Industrial Site and Improvement Analysis," Appraising Industrial Properties, Appraisal Institute (2005), 23-47, at 36 (“[O]ffice space takes up valuable storage space in warehouses, so it is generally kept to a minimum. Buyers are often reluctant to pay a premium for more than 30% office space.")

 “Generally, a clear height of 28 feet is ideal. Clear heights less than 20 feet represent significant functional obsolescence, and those less than 15 feet repre *334 sent severe obsolescence.” Douglas McNight, "A practical guide to Evaluating the Functional Utility of Warehouses,” The Appraisal Journal, Vol. LXVII, No. 1 (January 1999), 29-36, at 30, cited in The Appraisal of Real Estate, 13th Ed. (2008), p. 268, n. 8; and see Donald Sonneman, "Challenges In Appraising 'Simple' Warehouse Properties," The Appraisal Journal, Vol. LXIX, No. 2 (April 2001), 174-181 at 176; cited in The Appraisal of Real Estate, 13th Ed. (2008), p. 268, n. 8. See also The Appraisal of Real Estate, 13th Ed. (2008), p. 266 tbl.l 1.4 ("Many smaller warehouses can be operated with a clear span of 15 to 20 feet, but higher ceilings may be standard in the market."); and see Appraising Industrial Properties, supra, at 33 tbl.2.1 ("12-14 feet [clear ceiling heights are] [t]ypically considered substandard for most contemporary warehouse/inventoiy storage uses; currently found most often in older buildings ... ”).

 The Borough's expert calculates a total building area of 60,500 sq. ft. of which 30,500 sq. ft. is office space or 50.4% of the total building area; he does not advocate demolishing the second floor office area.

 Adjustments consisted of: Market Condition/Time (for each tax year at issue), Location, Building Size, Physical/Functional Attributes (ceiling height, essentially), Age/Condition, and for the land to building ratio of Comparable No. 1, as more specifically set forth in 90 Riverdale’s expert report.

 59,802 sq. ft. X $30 per sq. ft. of permitted bldg. = $1,794,000 rounded (based upon a determined $30 per square foot excess land value for all tax years).

 In its case-in-chief, 90 Riverdale attempted to present expert testimony of an attorney with experience in Environmental Flood Management. Without ruling on whether he qualified as an expert, the court disallowed the testimony as premature. 90 Riverdale, however, made no renewed effort to call the witness in rebuttal or otherwise, and accordingly, there is no testimony from this potential witness in the record.

 There is an "imperative need for an appraiser to verify the factual accuracy of the data relied upon to develop value estimates, as the validity of the appraiser’ conclusion depends upon the accuracy of the factual data upon which it is based.” 43 New Jersey Practice, State and Local Taxation, supra, at 106; See Coastal Eagle Point Oil Co. v. Township of West Deptford, 13 N.J.Tax 242, 287 (Tax 1993), aff'd o.b. per curiam, 15 N.J.Tax 190 (App.Div. 1995).

 See Appraising Industrial Properties, supra, at 35-36 ("[O]ffice mezzanines tend to add less value than office areas on the main floor. A mezzanine can also disrupt vertical storage patterns and offers less flexibility for reconfiguration or racking space.”)

 See note 5 infra.

 On cross examination 90 Riverdale’s expert testified that the $500,000 number was conveyed by someone to the owner of the Subject Property who, in turn, conveyed it to him. On re-direct (sixteen days later), however, the expert revised his testimony to indicate that he used various pages of Marshall Valuation Service for Remediation Costs to calculate the $500,000 demolition cost. These pages were not included in the addenda of 90 Riverdale's expert report; while they were marked for identification, they were not admitted in evidence by the court. The court found the expert’s revised testimony unpersuasive and affords it little weight. See also note 10 infra.

 While several offers to purchase the Subject Property are mentioned in his expert report, 90 Riverdale’s expert provided no concrete data as to the terms of those anticipated sales, no actual contracts were provided, and no letters terminating the contracts or rescinding the offer to buy were provided explaining why the deals never came to fruition. The Real Estate broker’s fact testimony was little more enlightening in this regard. Information as to efforts to lease the Subject Property before the current tenant is even more spurious. Only the current lease was provided and admitted in evidence.

 Irrespective of the flaw, out of all the comparable rentals 90 Riverdale's expert proposes for each tax year before the court (some of which are utilized for *341 more than one year), only one is in the same municipality, and only three are equal to or exceed the reduced size of the building on the Subject Property (with most being significantly smaller). About half the proposed comparable rentals exceed (1* or -) 20 % in total adjustments and half are below ( + or -) 20 %.

 Most proposed comparable sales are in other towns and are smaller than Subject Property (significantly smaller if you use 60,000 sq. ft. instead of 40,656 sq. ft.) Size adjustments to proposed comparables are made, but as compared to 40,656 sq. ft. not 60,000 sq. ft

 In some instances it appears that the expert may be double dipping since he already accounted for ceiling height difference by using the reduced size of the building in the Subject Property (i.e. 40,656 sq. ft. and not 60¡000 sq. ft.) as the point of comparison (which results in an increased clear ceiling height at the Subject Property of 24 feet).

 Avaivable at: http://boolcs.google.com/books?id=KoiMJEGn8-cC& pg=PA92& lpg=PA92& dq=the + primary + consideration+in + the+reconciliation +proeess& source=bl& ots=BG8qV8-B-7& sig=H!VNbvym0EzrPJt5qlFLDrHKwk& hl=en&sa=X& ei=-tT2UY2VIp034A0h4IHQBg& ved=OCCwQóAEwAA# v=onepage& q=theprimary%Considerationmihereconciliationprocess& f=false, last visited July 29, 2013. See also USPAP 2012-2013 Ed., Standards Rule 1-6.

 Derived from a Danish fairy tale, The Emperor’s New Clothes by Hans Christian Andersen, first published in 1837, the phrase, "the Emperor has no clothes” is often used for any obvious truth denied despite the evidence. See http://answers.yahoo.com/question/index?qid=l006050209041, last visited July 29, 2013.

 The court examined the comparable leases on other properties offered into evidence with “full recognition that they are in a different market” because there were aspects of the subject property in Westinghouse that “were not readily available in the market.” supra, 9 N.J.Tax at 106. The same goes for the subject property in Hull Junction Holding Corp. v. Princeton Borough, 16 N.J.Tax 68, 80 (Tax 1996) where although different components of the property were valued together, each use of the property produced income independently of the next. See Levitz, supra, 17 N.J.Tax at 491.