**NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS**

**TAX COURT OF NEW JERSEY**



**MALA SUNDAR
PRESIDING JUDGE**

Richard J. Hughes Justice Complex
P.O. Box 975
Trenton, New Jersey 08625-0975
609 815-2922, Ext. 54630 Fax 609 376-3018

November 16, 2021

Robert Guanci, Esq.
Waters, McPherson, McNeill, P.C.
Attorneys for Plaintiff

Ted Del Guercio, III, Esq.
McManimon, Scotland & Baumann, LLC
Attorneys for Defendant

> Re:    Cody Realty, LLC v. Borough of Carteret
>        Block 2702, Lot 25
>        Docket Nos. 002251-2014, 001524-2015, 000908-2016, 000940-
>        2017, 004541-2018, 002212-2019, 001237-2020

Dear Counsel:

This letter constitutes the court's decision following trial of the above-captioned matters involving plaintiff's challenge for tax years 2014 through 2020, and defendant's challenge for tax years 2018 through 2020,[1] to the local property tax assessments imposed on the above referenced property (Subject). The primary disagreements between the parties' appraisers were the appropriate valuation methodology, and treatment of the portion of the Subject's lot which is being used for outdoor storage of trucks/automobiles and/or additional parking.

For the reasons explained more fully below the court agrees with plaintiff's appraiser that the income approach is a viable valuation methodology for the Subject. However, the court rejects his value conclusions under this approach for all tax years because (a) his concluded potential gross income for the Subject is unpersuasive due to his failure to review any of the leases or lease abstracts of rentals he used as comparables; and (b) his concluded values for tax

---

[1] The Borough withdrew its counterclaim for tax year 2017 as untimely filed.





years 2019 and 2020 did not include value attributable to the income producing portion of the Subject's lot (leased for billboard use). The court therefore accepts defendant's appraiser's sales comparison valuation method. However, it rejects his +20% adjustment to the comparables' sale prices for the Subject's lot area being used for storage/additional parking, as unsubstantiated. Accepting his other adjustments (as modified), rejecting certain comparable sales, and increasing the capitalization rate for the billboard portion of the lot, the court finds the value of the Subject for each tax year as $2,561,280; $2,820,480; $3,108,480; $3,252,480; $3,270,770; $3,558,770; and $3,990,770. Applying the corresponding Chapter 123 ratios (except for tax year 2017 due to a district-wide reassessment and as to which the Borough withdrew its untimely counterclaim), the court reduces the assessment for tax year 2014 to $2,506,470, increases the assessment for tax year 2018 to $3,270,770, and affirms the assessments for all other tax years.

**SUBJECT DESCRIPTION**

The Subject is a lot measuring five acres or 217,800 square feet (SF). It is in the Light Industrial (LI) zone. Three easements run through it: a 10′ wide sanitary sewer easement; a 15′ wide drainage easement; and a 20′ Middlesex Water Company Right-of-Way (which cuts across the lot). It is improved by a circa 1977 building in average condition with 28,800 SF of gross building area (GBA) made up of warehouse and office space, with a clear ceiling height of 18′ in the warehouse/repair portion. The land-to-building ratio (LTBR) is 7.6 (217,800 SF land ÷ 28,800 SF building). The floor area ratio (FAR) is 0.13 (28,800 SF building ÷ 217,800 SF land). There are 21 bay doors for access into the service area.

The Subject is used in furtherance of a towing and repair business. Towing is done for the New Jersey Turnpike Authority. The aerial view of the Subject shows a significant portion of the lot (paved and unpaved) with several parked vehicles, including towed and repaired

vehicles, trailers, and tow trucks. One of the tow trucks is identified with a signage of the business. The building also has a signage of the business' name and services provided ("tires," "collision," and "repair" for trucks).

Another portion of the lot contains a two-sided, non-digital billboard, which is clearly visible when travelling on the New Jersey Turnpike. It is leased to an unrelated third party under a contract originally signed in March 1996 at $25,000 per annum with a 5% increase every five years.[2] For tax year 2019 onwards, defendant's assessor segregated the assessment for the billboard and separately identified it with a qualifier (Block 2702, Lot 25, B01).[3]

**VALUE CONLCUSIONS**

Each party proffered its real estate appraiser's value opinion, which was accepted by the court as an expert opinion. Plaintiff's appraiser used an income approach because he viewed the Subject as one "typically traded based on its income generating potential," and "leased on the open market." He used 21 triple net leases of warehouses with start dates ranging from 2011 to 2019, two of which were in the defendant (Borough), and five in Avenel, a submarket in the Borough. Leased areas ranged from 10,000 SF to 37,260 SF, and the per SF (PSF) rents ranged from $4.92 to $9.12. He used CoStar, which, he testified, was a credible data source particularly for lease information, and the data when verified with a leasing agent would be 90% accurate. Therefore, he stated, he did not need to personally review the leases he chose as comparables.

---

[2] Plaintiff appears to have assumed the lease as the document shows Ho Ro Realty as the landlord.
[3] See Division of Taxation, Real Property Appraisal Manual For New Jersey Assessors, 230 (3rd ed. 2021) ("For identification purposes, billboards should be identified by the block and lot numbers assigned to the land on which the billboard is located and the qualification code "B" followed by the numeric." The assessor should report the billboard's assessment as a "new line item" and "as an improvement value only").

Selecting leases with start dates closer to the valuation dates, he arrived at a PSF rent for each tax year at $5.50; $5.50; $6; $6.50; $7; $7.50; and $8. He deducted the potential gross income (PGI) for each tax year by a vacancy and credit loss at 7.5% (tax years 2014-2016) and 5% (tax years 2017-2020). He then added the billboard rental income ($28,941 for tax years 2014-2016 and $30,388 for tax years 2017 and 2018) to compute the effective gross income (EGI). For tax years 2019 and 2020, he noted that "the billboard was separated as its own lot," and he did not value it since he was retained to value only Lot 25.

After deducting 12% of the EGI for expenses (5% each for management and leasing commissions; 2% for reserves), he capitalized the resulting net operating income (NOI) at 7.3%; 7.3%; 7.2%; 7%; 6.9%; 6.9%; and 6.8% for each tax year, using the band of investment method.

The Borough's appraiser used the sales comparison approach because, he opined, "the likely buyer" would be an "owner-user" considering the Subject's current use and maximal utility of its lot. He used sales of warehouses (ten for tax years 2014-2017, nine for tax years 2018-2020) located in central New Jersey (including two in the Borough), several of which were purchased for owner-occupation. Sale dates ranged from 2009 to 2019, lot sizes from 1.15 acres to 4.35 acres, and GBA from 12,650 SF to 150,400 SF.

Using a PSF of GBA as the unit of measurement, he first adjusted the comparables(s) sale price(s) for market conditions. He then adjusted for LTBR differences at +20% (higher the LTBR, more the flexibility, ample parking, "better on-site circulation and potential building expansion"); and at 5% for differences in amount of office space, doors/bays count, condition, and location. His value conclusions, at a PSF amount, were $90; $95; $110; $115; $125; $135; and $150 for each tax year 2014-2020. To his value conclusions, he added the value of the billboard under an income approach. For all tax years, he opined the billboard's PGI as $30,000

4

based on five comparable leased billboards, with most weight to a two-sided, non-digital, billboard in Hackensack (leased at $30,600 per year) as it was located by Intestate 80, a heavily traveled highway like the Turnpike. With 3% allowance for vacancy/collection loss, and 4% for operating expenses for tax years 2014-2017 (2% each for management fees and reserves) but at 6% for tax years 2018-2020 (3% each for management fees and reserves), he capitalized the NOI at 6% (tax years 2014-2018) and at 6.25% (tax years 2018-2020).

A summary of the assessments and value conclusions follow:

| Tax Year | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Assessment | $2,594,100 (billboard included) | $2,594,100 (billboard included) | $2,594,100 (billboard included) | $2,933,800 (billboard included) | $2,933,800 (billboard included) | $2,933,800 +$470,000 $3,403,800 | $2,933,800 +$470,000 $3,403,800 |
| Plaintiff | $2,120,000 | $2,120,000 | $2,310,000 | $2,620,000 | $2,830,000 | $2,620,000 (no billboard) | $2,830,000 (no billboard) |
| Borough | $2,590,000 + $470,000 $3,060,000 | $2,740,000 + $470,000 $3,210,000 | $3,170,000 + $470,000 $3,640,000 | $3,310,000 + $470,000 $3,780,000 | $3,600,000+ $440,000 $4,040,000 | $3,890,000+ $440,000 $4,330,000 | $4,320,000+ $440,000 $4,760,000 |

**FINDINGS**

(A) PRESUMPTION OF CORRECTNESS

Imposed assessments are presumptively correct. MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). This is "a construct that expresses the view that in tax matters, it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985) (citations omitted). The burden of overcoming the presumptive correctness is upon the party challenging the assessment's validity. Ibid.

At the end of plaintiff's proofs, the court denied the Borough's motion to dismiss the complaints and ruled that plaintiff had overcome the presumption of correctness of the assessments. Having done so, the court now need not separately determine "whether" the Borough has also "overcome the presumption with respect to [its] counterclaim[s]" for tax years

5

2018-2020.  See MSGW, 18 N.J. Tax at 378.  The court will therefore evaluate whether the presented evidence suffices to change the assessments at issue.

(B) VALUATION

*(1) Highest and Best Use (HBU)*

Plaintiff's appraiser's report noted that the Borough's LI zone permitted various industrial and commercial uses, thus, the Subject's use was legally conforming in that "industrial garage use" is permitted in the LI zone, and because the Subject met "all the necessary lot size requirements."  He insisted that the LI zone did not permit external storage, but only vehicle parking, therefore, the Subject's lot was, and could only be used, for additional parking.

His report noted that "[i]n the context of most probable selling price (market value), another appropriate term to reflect [HBU] would be most probable use. In the context of investment value, an alternative term would be most profitable use."  He concluded that the Subject's HBU as vacant was "for development of an industrial facility."  As improved, the Subject's HBU was "continuation of the existing use" which "embodies the most profitable and productive use," there being no alternative use "that would economically justify the removal of the existing improvements."

The Borough's appraiser's report noted that the permitted uses in the Borough's LI zone were industrial, office and research.  He insisted that the LI zone permitted parking and external storage, and that the vehicles on the Subject lot were stored since towed vehicles were charged for storage.  His report stated that the minimum lot size was one acre with 50% maximum site coverage and opined that the Subject "appears to be legally nonconforming."  He concluded that as vacant the Subject's HBU was for the "development of the site for industrial use" and as improved, is its "continued industrial use."  His report noted that the improvement on the Subject

6

was an "industrial building," and that due to the "size and characteristics of the" Subject, the most probable buyer would be an owner-user. In his land analysis, his report also noted that the Subject is a "truck service facility with ample on-site parking and outdoor storage areas" thus, the "site accommodates this use well." Similarly, in his improvement analysis, his report noted that the current "improvements adequately support the operation as a truck service facility."

The Borough's zoning code requires towed vehicles to be kept in a "secured storage area . . . in an area legally zoned for such use." Zoning Code §238-6(D)(1)(d).[4] As to the LI zone, the code permits "screened storage and warehousing." Id. §160-135(A)(3). Accessory uses include "enclosed warehousing and storage of goods," and "garage space necessary to store any vehicle on premises." Id. §160-135(B).

Both appraisers agreed that the Subject's HBU as improved is for the continuation of its present industrial use. Neither opined that the Subject had any other financially feasible or maximally productive alternative use. The LI zone allows for screened storage and warehousing. Therefore, and regardless of their interpretation of whether the vehicles on the Subject's lot are "stored" or "parked," or their disagreement as to the lot's potential buildability, the court agrees that the Subject's HBU as improved is for its current use.[5]

---

[4] The Borough's zoning code defines "outside secured" area as "[a]n automobile storage facility that is not indoors and is secured by a fence, wall or other man-made barrier that is at least six feet high. The facility is to be lighted at night." Zoning Code §238-1. "Outside unsecured" area is defined as "[a]n automobile storage facility that is not indoors and is not secured by a fence, wall or other man-made barrier and all other storage facilities not defined above as inside building or outside secured." Ibid.

[5] Plaintiff's appraiser's reservations of buildability due to easements notwithstanding, he concluded that the Subject's "development . . . for uses consistent with existing zoning is financially feasible." The Borough's appraiser's opinion of a 100,000 SF potential build-up notwithstanding, he concluded that there was no "alternative use that could reasonably be expected to provide a higher present value than the current use," and testified that this potential build-up was included to support his market demand analysis for industrial use property.

*(2) Appropriate Valuation Methodology*

Each appraiser disagreed with the other's chosen valuation methodology, and whether the Subject's LTBR adds more value to a buyer owner-occupier. Plaintiff's appraiser opined that if the Subject were to become vacant, it would be considered a rental (investment) property since the industrial market generally, and in the Borough, is one of rentals. Thus, he stated, the income approach was most appropriate, with several warehouse comparable leases but no warehouse comparable sales. He also opined that since the three easements severely restricted the Subject's future buildability and the Subject lot could only be used for additional parking per the Borough's zoning, the lot size does not add any value. Plus, he noted, there was no market evidence to adjust the comparables for differences in FAR/LTBR.

The Borough's appraiser opined that the sales comparison approach was most appropriate since a probable buyer would be one like plaintiff, i.e., an owner-occupier desiring fully utility of an ample lot space in furtherance of the buyer's business. This conclusion, he testified, flowed from the HBU of the Subject as improved was for the continuation of its present use. He opined that the income approach "does not reflect the primary analysis undertaken by a typical owner-user," which here was the intense and full use of the Subject's lot as is currently being done. He noted that value of industrial properties has been steadily increasing in the Borough as evidenced by the increasing rents of competing properties (warehouses/distribution centers), and that the Subject was an extremely attractive candidate for sale given its favorable location (amongst industrial/commercial properties, close to the Turnpike), and its leasable billboard. He testified that the Subject was developed and improved for maximal outdoor storage, therefore, it was proper to increase the sale prices of almost all comparables since they lacked external storage and/or ample on-site parking.

8

Valuation of an owner-occupied industrial property is not necessarily tied to one method. "Even in the case of owner-occupied properties, the income approach may also be applied." S.I.R. Educational Fund, Industrial Real Estate, 467 (4th ed. 1984). See also M. I. Holdings, Inc. v. Jersey City, 12 N.J. Tax 129, 138 (Tax 1991) ("warehouses are commonly rented by their owners as investment property," therefore "the income approach is a viable method of valuing them") (citation omitted).

The sales comparison can also be a viable approach for owner-occupied industrial properties. Industrial Real Estate, 450 (sales comparison approach "most nearly represents the views and often the decisions" of the market participants, therefore, can be "the best one to employ" for valuing improved industrial property). Cf. Shulton, Inc. v. City of Clifton, 7 N.J. Tax 208, 217 (Tax 1983) (rejecting the income approach as an appraiser would have to "construct an amalgam of attenuated hypotheses concerning economic rent, projected expenses, whether the leases would be gross or net, whether the property is best suited for a single tenant or multiple tenancies and the anticipated return on investment").[6]

Here, both appraisers concluded the Subject's HBU as improved was for the continuation of its present "industrial" use and deemed the Subject as a warehouse since both used only warehouses as comparables.[7] The Subject is located amongst predominantly industrial-use properties which were mostly rented. Indeed, the Borough's appraiser's market analysis studies were based on the rent comparisons and vacancy rates (based on net absorption) of what he

---

[6] The Borough's appraiser's hybrid approach is also not facially improper. See Aliotta v. Twp. of Belleville, 27 N.J. Tax 419, 427 (Tax 2013).

[7] Industrial property is defined as "land or land and improvements adaptable for industrial use; ideally, a combination of land, improvements, and machinery, which is integrated into a functioning unit intended for the assembling, processing, and manufacturing of finished or partially finished products from raw materials or fabricated parts, such as factories; or a similar combination intended for rendering service, such as laundries, dry cleaners, or storage warehouses." N.J.A.C. 18:12-2.2(f).

termed as "warehouse/distribution comparable properties," and his report included 29 rented warehouses in the Borough/Avenel market (different from the seven triple net leases in the Borough/Avenel used by plaintiff's appraiser). The data thus evidences an identifiable rental market for the Subject and tends to support plaintiff's appraiser's opinion that the income approach is more credible because the Borough's industrial market is in rentals. That each appraiser differed in their opinion of the usability of the Subject's site size is an issue of whether an adjustment for differences in LTBR is justified. Such adjustment can be accomplished under either method, thus, is not a reason to deem either value approach as more credible than the other.

*(3) Value Conclusions*

Unfortunately, the court finds plaintiff's income approach problematic for the reasons explained below. Thus, while more appropriate as a methodology here, it does not carry the day.

i. Plaintiff's Appraiser's Failure to Review/Analyze Leases or Lease Abstracts

A primary problem is the credibility of plaintiff's appraiser's conclusion of the Subject's PGI due to his failure to peruse and review any of the leases. Lease 2 was for a one-year term starting September 2012 and ending August 2013. He used this as a comparable for tax years 2014 and 2015, however, as of the assessment date for tax year 2015 (October 1, 2014), this lease had expired. He failed to explain why the lease, regardless of its expiration, is a credible value indicator, or why an adjustment for time was unwarranted (the lease had the lowest rent at $4.92 PSF. Leases in January 2013, June 2014, and July 2014 were at $5.50 PSF to $6.25 PSF).

Lease 3 had a start date of September 2012, and no end date. It was also used as Lease 7, which had a start date of October 2014 after being on the market since April 2013 and reportedly vacant for 10 months. It then appears that Lease 3 which started September 2012 was

10

a six-month lease which expired April 2013. If so, it is questionable whether it is reasonable to use the lease for tax years 2014 and 2015.

Lease 7's start date was reported as October 2014. Plaintiff's appraiser used it as a comparable for tax year 2014 (which has an assessment date of October 1, 2013). It had no end date, and was used as a comparable for tax years 2015 and 2016. Does it mean it had a two-year term? The same issue, i.e., start date but no end date on the CoStar summary lies with Leases 11 (used for tax years 2017 and 2018), 13 (used for tax years 2017-2019), 15, (used for tax years 2018-2020) and 16 (used for tax years 2018-2020). How is the court assured that these are viable comparables for the tax years at issue?

Another problem is plaintiff's appraiser's uncorroborated conclusion that the "starting rent" reported in CoStar is the flat rent for the entire lease term. Whether this was in fact the case is unknown since he did not review any of the leases. And while this may be a reasonable supposition where the lease is for a one-year term (see e.g. Lease 2 which was for a one-year term and only included a starting rent of $4.92 PSF), it is not so for longer periods. For instance, Lease 6 commenced in 2015 for a ten-year term (used by the appraiser for tax years 2014-2016). CoStar noted the starting rent was $5.25 PSF, which was also the "effective rent." Lease 14 commenced in 2018 for a ten-year term (used by the appraiser for tax years 2018-2020). CoStar noted the starting rent was $6.75 PSF, which was also the "effective rent." It is difficult to suppose that a lease stayed flat for the entirety of its ten-year term, when there is no definition or explanation of what CoStar means by "effective rent," and when plaintiff's appraiser testified that the industrial market saw a marked upward change from 2017 onwards (which is why he used 7.5% as a vacancy rate only until tax year 2017). Indeed, Lease 20 appears to corroborate

11

his testimony of an upward market: it was for a seven-year term beginning 2019 with rents subject to escalations in "steps."

The court also questions the credibility of using leases with no end date, and for which CoStar reports only a starting rent. See e.g. Leases 3, 7, 11, 13, 15. If the court were provided sample leases or lease abstracts, it may have been persuaded by plaintiff's appraiser's testimony that starting rents stayed flat through the lease term. Such documents were not provided (let alone reviewed by plaintiff's appraiser).

While CoStar may be widely used by real estate appraisers and be deemed to publish reliable data, it does not, as plaintiff's appraiser testified, justify the lack of the need to review and verify the CoStar data with each of the comparable leases. See VBV Realty, LLC v. Twp. of Scotch Plains, 29 N.J. Tax 548, 567 (Tax 2017) (while data such as from CoStar "may be a valuable starting point for identifying likely comparable properties . . . it is the process by which an appraiser verifies the accuracy of that data and information that is the hallmark of an effective appraisal report and sound opinion of value"); 90 Riverdale, L.L.C. v. Borough of Riverdale, 27 N.J. Tax 328, 338, n.11 (Tax 2013) ("There is an imperative need for an appraiser to verify the factual accuracy of the data relied upon to develop value estimates, as the validity of the appraiser's conclusion depends upon the accuracy of the factual data upon which it is based") (citation and internal quotation marks omitted); Appraisal Institute, The Appraisal of Real Estate, 385 (14th ed. 2013) ("referencing the source of secondary data only confirms its existence and does not verify the transaction"). While plaintiff's appraiser testified that he had verified almost all of the above identified leases, the testimony is not credible. If he had verified the CoStar data, these issues would not arise, or if arose, would have been credibly explained.

Also problematic is plaintiff's appraiser's use of a comparable's starting rent even when CoStar indicates it had escalations. Lease 1 commenced January 2012 and ended December 2016, with rent escalation in "steps." The "starting rent" was $5.50 PSF. It would be logical to assume that as of October 1, 2013, and/or October 1, 2014 (the two tax years he used this lease as a comparable), the rents would be higher due to the escalations. Or maybe the escalation was in the lease's third year. However, the appraiser used a flat $5.50 PSF for both tax years with no explanation in this regard.

The same is the situation with Lease 18 (used by the appraiser for tax years 2019 and 2020) which commenced April 2018 for a five-year term and had escalations in "steps." Did the step-up could occur as of October 1, 2019, the lease's second year? Or did it occur in its third year? Again, without reviewing the actual lease, it is difficult to agree that the rent for Lease 18 remained at the "starting rent" of $6.95 PSF for tax years 2019 and/or 2020.

Similarly, Lease 16 which commenced December 2017 (for an unknown term, but per plaintiff's appraiser was a renegotiated renewal), escalated at 2.5% per year. He used this lease for tax years 2018 through 2020. Should the court assume that since the appraiser only used the starting rent for each tax year, there were no escalations for any tax year? A review and verification of the lease terms would have answered this question. Cf. Lease 20, with a seven-year term. CoStar reports it as having a start rent of $9.25 PSF but an effective rent of $9.12 PSF (presumably because the escalations were in "steps" however it is unknown how CoStar computes the effective rent). Plaintiff's appraiser used $9.12 PSF in his analysis.

The court is unpersuaded by plaintiff's appraiser's opinion that there is no difference between the start date rent and an effective rent, and that concessions or build out had no effect on the net rent. Plaintiff's decision to use the CoStar reported start or effective rent without

13

verifying the why's of the same or of the escalations and impact on the rent over a lease's term renders unpersuasive his conclusion of the Subject's PGI. See First Republic Corp. of America v. Borough of East Newark, 16 N.J. Tax 568, 578-79 (Tax 1997) ("where income changes are known, as is the case with step-up leases, those increases in income, to the extent they reflect economic rent, should be reflected in the appraiser's estimate of the property's future income" and that rent concessions should "be considered in the development of the income analysis").

The first step in the income analysis is a credible conclusion of the Subject's PGI. The court finds this lacking. Therefore, it need not (and cannot) analyze the remaining steps to determine whether plaintiff's appraiser's value conclusions nonetheless survive scrutiny. VBV Realty, LLC, 29 N.J. Tax at 567 ("when an appraiser does not properly source, verify, and analyze that data and information to ensure the integrity of the opinions of value derived therefrom, those conclusions are not credible evidence of market rents" therefore, the appraiser's "income capitalization conclusions . . . are entitled to little weight").

ii. Plaintiff's Appraiser's Failure to Value Billboard Income for Tax Years 2019-2020

Billboards "are deemed to be real property" and are "subject to local property taxation." N.J.S.A. 54:4-1.20; N.J.A.C. 18:12-10.2(e). Therefore, the accepted methodologies apply to their valuation. See Real Property Appraisal Manual For New Jersey Assessors, 236 ("As with the appraisal of other real property for local property tax purposes, the three accepted approaches to value (income, sales comparison, and replacement cost less depreciation) are applicable to the valuation of billboard structures"). If an income approach is used, then "economic rent must be applied" else it "will not yield credible results." Ibid.

Here, plaintiff's appraiser maintained that billboard leases were unattainable, therefore, he used the Subject's billboard lease, although it was entered in 1996 with 5% annual step-ups.

14

The testimony is not credible because the Borough's appraiser was able to obtain such leases. However, the court has rejected plaintiff's appraiser's conclusion of PGI, thus, this issue is moot.

More troublesome is plaintiff's appraiser's decision to not value the billboard portion of the Subject's lot for tax years 2019 and 2020. It is true that the Borough's assessor identified the billboard with a qualifier (B01) for tax years 2019 onwards. However, this does not mean that a separate lot was created for the billboard. Rather, the qualifier is required as an administrative measure so that all income from the property is captured. See n.3.

There is simply no evidence that the Subject's lot was subdivided into a new lot, or that a new lot was created on the Borough's tax map comprising the billboard. Identification of the billboard portion by a qualifier does not change the Subject's status as a single economic unit for valuation purposes.[8] Omitting to include the billboard's value equates to valuing less than all the bundle of rights in the Subject which is an improper valuation of a fee simple real estate.

In sum, the court agrees with plaintiff's appraiser that an income approach is a viable valuation methodology for the Subject. However, it rejects his value conclusions under this approach for all tax years as his PGI conclusions were unpersuasive, and also because he did not value the income producing (billboard) portion of the lot for tax years 2019 and 2020.

iii. The Borough's Appraiser's Value Conclusions

The court accepts the Borough's appraiser's sales comparison approach, which as noted above, is also a viable valuation methodology for the Subject. Initially, the court rejects some of his comparables. Two of those are at 333 Cantor Avenue (sold June 22, 2017, for $4,000,000, and used for tax years 2018, 2019), and 330 Dalziel Road (sold November 21, 2019, for

---

[8] That the parties' respective Case Information Statements for tax year 2020 (but not for tax year 2019) identify the qualifier as being included in the appeal does not require a conclusion that the billboard portion of the Subject is a separate, non-contiguous, independent economic lot.

$3,950,000, and used as a comparable for tax year 2020). Both sales were tenanted when sold (four tenants in 333 Cantor Avenue, and two tenants in 330 Dalziel Road), thus, the sales were of a leased fee. A property's leased fee value can be materially influenced by the leasehold interest, tenant quality, and the stream of rental income. Therefore, their sale price raises are not necessarily credible value indicators.

The Borough's appraiser's report noted that "all land sales represent the conveyance of fee simple property rights. Therefore, no adjustment is necessary for this factor." He testified that he did not verify the leases or lease income for either sale, however, he claimed, the leases in-place were at market. As to 333 Cantor Avenue, he stated that this was evidenced by his capitalization (Cap) rate analysis in his report, but his report did not contain this information as to this comparable. Note that the sale was marked NU26 because it was an I.R.C. §l031 exchange. The appraiser was unaware of this since he did not review the contract of sale or deed on the property. As to 330 Dalziel Road, his report noted that the leases were nearing expiration in 2020, and the buyer intended to either increase the rents or re-lease the space at market to new tenants. On cross examination, he stated that he recalled hearing that some leases had expired in 2020, and the rents were either renewed or were at market. Sans corroboration with the old and new leases, it is difficult to agree that the in-place leases were actually renewed, or the property was re-leased. Therefore, it is also difficult to simply accept that the property's sale price is a credible indicator of the Subject's value. His lack of review of the leases (in place when sold, or post-sale), also renders unpersuasive his opinion that the sale's low implied Cap rate (5.56% based on a "projected" NOI of $220,899) is evidence of at-market renewals or new leases.

The court also rejects the following three comparables because they involve sales of multiple lots. These types of sales are problematic when there is no verification as to allocation of the sale price. See Industrial Real Estate, 430 (appraisers should "be careful not to place too

16

much emphasis on purchases of adjacent sites as 'comparable data.' Industrial plant users often pay premium prices for abutting properties because this can be the only way they can obtain land for expansion or parking"). One is 3001 S. Clinton Avenue in South Plainfield (sold March 26, 2015, for $2,525,000). Although the CoStar data summarized in the Borough's appraiser's report shows only one lot being sold, the sale deed provided by plaintiff showed that the sale included several additional lots in Piscataway. The Borough's appraiser was unaware of these lots since a former employee of his company had, in 2017, verified only one lot. The appraiser also conceded that inclusion of several lots could impact the sale price.

The second sale is 7 Progress Street in Edison (sold October 4, 2016, for $1,975,000). The CoStar data summarized in the Borough's appraiser's report shows the sale as including two lots. The appraiser was unaware of this fact. The court is unpersuaded by his bare testimony that inclusion of two lots does/did not impact this comparable's sale price. An additional problem is that he was unable to verify whether its zone R-I (Restricted Industrial) was comparable to the Subject's LI zone. Permitted uses in the R-I zone do not list warehouse or distribution centers. Edison Zoning Code §37.31.1. Nor are they identified on the conditional use list. Id. §37.31.4.

The third sale is 50 Ingham Avenue in Bayonne (which sold December 12, 2018, for $7,000,000). CoStar data notes the sale as involving two lots, 5 and 6. While the appraiser's report indicates the sale was confirmed with the buyer's broker, there was no explanation whether the sale price covered one or two lots, and if so whether the sale price is a credible value indicator of one lot (like the Subject).[9] Therefore, the court rejects these three sales. See The

[9] The NJACTB website (www.njactb.org) identifies Lot 5 as Class 1 (vacant land), and Lot 6 as Class 4B (improved industrial property).

Appraisal of Real Estate, 385 ("[g]enerally, the secondary sources do not provide adequate information . . . if multiple properties were involved in the sale" therefore, it is imperative to ascertain the accuracy of published data).

Next, the court agrees with the appraiser that sometimes a larger LTBR in an industrial property can have more value to a buyer/tenant. See e.g. Brockway Glass Co. v. Twp. of Freehold, 10 N.J. Tax 356, 369 (Tax 1989) ("industrial properties must have [LTBR] that allow plenty of space for parking, truck maneuvering, yard storage, and expansion") (citation and internal quotation marks omitted). This can be a basis for justifying adjustments "between comparable sales properties and the subject property." Industrial Real Estate, 428.

As noted above, the Borough's zoning code requires towed vehicles to be kept in a "secured storage area" which is "in an area legally zoned for such use." Zoning Code §238-6(D)(1)(d). Its LI zone permits "screened storage and warehousing." Id. §160-135(A)(3). Accessory uses include "enclosed warehousing and storage of goods," and "garage space necessary to store any vehicle on premises." Id. §160-135(B). As evidenced by the pictures in the appraisal reports, the Subject's lot is externally fenced and being used for vehicular storage (and tires), while the building is being used for internal storage of repair equipment and accessories. Thus, the Borough's appraiser's opinion that the Subject's maximal productivity to a prospective buyer (investor or owner-occupier) is the ability to fully use the site as is currently being done, is reasonable. Therefore, his further opinion that ability to use the Subject's entire lot is a superior feature requiring adjustments to comparables lacking the same is also reasonable.

However, the appraiser has failed to persuade the court that the adjustment for LTBR differences should be at +20%. This quantification is purely subjective. In theory it is reasonable to presume that a buyer would pay more if the lot size can fully and intensely be used (as here,

18

for external storage or if a warehouse, for extensive parking of, and turning width for, delivery trucks), because rents for warehouses were steadily increasing in the Borough (and in general) at least since 2017. However, some evidence of this theory is needed to support the adjustment. For instance, he disputed plaintiff's appraiser's statement that Amazon began to buy/use lots/land to park its fleet of trucks for a "last mile distribution"[10] from or after 2020, contending this occurred in 2013. If so, he could have used rentals or sale prices of such properties or lots as evidence for the +20% adjustment, even if the lots were located outside the Borough (just as he used comparable sales from outside the Borough). Lots leased for outdoor storage or additional parking such as overflow of inventory of a car dealership could likely have been used to support the +20% adjustment. This was also not done.

The comparables he used also do not comport to his theory. He testified that a probable buyer of the Subject would be an owner-occupier like plaintiff which will want and can obtain maximal site usage, i.e., for external storage of personal property, since this analysis flowed from his HBU analysis. However, his comparable, 7 Parkway Place (located in Edison, which sold September 26, 2011, for $3,780,500 and used for tax years 2014, 2015) was purchased for the building's size. Per the appraiser's report, the buyer from China contracted to buy the property within an hour of its virtual tour and, while some "users don't need interior loading," the "buyer preferred it," and although a "building this size 50,400 sf, is not regularly available for sale in this market," it was "perfect for a buyer who needs that size," therefore, "the sale price represents a value to an owner user and not necessarily an investor because the property was perfect for the buyer's needs." These comments indicate that the outdoor parking or storage was not as crucial

---

[10] "Last mile distribution" is the last step in the distribution process, which is delivery of the goods from a distribution center to the end user.

to the buyer as was internal loading and storage. Yet, the Borough's appraiser applied the +20% adjustment. If the buyer of a warehouse has no need for outdoor storage or parking, rather uses the property only for indoor storage (because the products are such which cannot, and need not, be externally stored), then, the buyer may not find the Subject competitive. There was no evidence that buyers of the appraiser's comparable warehouses lacked a much-needed extensive outdoor storage.

If the Subject's lot was superior due to additional and ample parking, then the appraiser's adjustment at +20% for property at 50 Ingham Avenue in Bayonne is questionable. This property is noted as having a FAR of 0.36, which the appraiser's report notes, "allows for ample surface parking." He nonetheless applied the +20% adjustment. Therefore, the court finds it difficult to agree that, without more, the buyer's status as an owner-occupier and the mathematical calculation of the LTBR or FAR, justifies a +20% adjustment.

The court accepts the adjustments for number of bay doors (except for sale of 6 Connerty Street, East Brunswick, which had 16 loading docks and 5 bay doors thus, and as the appraiser testified, should not have been adjusted. Data on sales of 15-19 Evans Terminal, Hillside, and 10 Production Way, Avenel, did not include bays/docks count); condition; and location. There was nothing to refute the reason for, or the reasonableness of, their provision.

The court also accepts the Borough's appraiser's income approach for the portion of the Subject's lot generating billboard income for all tax years. However, it disagrees with his Cap rate of 6% for tax years 2014-2017 and 6.25% for tax years 2018-2020. His reports did not elucidate the basis for the rates, and his testimony was that it was based on the market analysis data in the reports. For tax years 2014-2017, the industrial market information in his report pertaining to industrial properties did not include any Cap rates. Both appraisers' reports

however contained the RERC Cap rates for second-tier industrial properties,[11] which as of the third quarter (Q3) of 2013-2016 was 8.2%; 8.1%;7.9%; and 7.7%. For Q3 of 2017-2019 (included in plaintiff's appraiser's report), it was 7.3%; 6.8%; and 7%. The Borough's appraiser's second report (for tax years 2018-2020) included Cap rates from CoStar for "all industrial" properties for the first quarter (Q1) of 2013-2020 for three regions as follows: (A) Northern New Jersey Metro (7.41%; 7.11%; 6.76%; 6.46%; 6.23%; 6.11%; 6.03%; 6.03%); (B) Brunswick/Piscataway Cluster (7.04%; 6.81%; 6.46%; 6.12%; 5.83%; 5.68%; 5.62%; 5.62%); and (C) Carteret/Avenel Submarket (6.88%; 6.65%; 6.29%; 5.95%; 5.69%; 5.58%; 5.62%; 5.62%). However, there was no demarcation of property class. While the Borough's appraiser's report included a list of 29 "Warehouse/Distribution Comparable Properties" in the Borough, there were no Cap rate data nor the years to which the rental information data pertained. None of the data also provided specific Cap rates for billboard leased portions of real estate.

Since both appraisers deemed the Subject to be a second-tier industrial property, it is logical to apply the Cap rates pertaining to such properties, and here, with the RERC data. While the location is a plus for the Subject, the lease provisions for the billboard on the Subject should also be considered: that the contract could be terminated or rent reduced if the tenant is unable to use the billboard for advertising (to either $100 annually, or to 50% if only one side is used for advertising). Thus, the court finds that an appropriate Cap rate is 7.5% for tax years 2014-2017 and 7% for tax years 2018-2020. These rates also comport with plaintiff's appraiser's concluded Cap rates for the Subject (but without the additional risk under the lease terms as

[11] Plaintiff's appraiser agreed that the Subject while in average condition, would likely fit in more as a second-tier industrial property due to its location. Per RERC, second-tier investment properties are "aging, former first tier properties, in good to average locations." Going-in Cap rate is defined as "the overall [Cap] rate found by dividing a property's net operating income for the first year after purchase by the present value of the property." The Appraisal of Real Estate, 517.

noted above) which were at 7.3% (tax years 2014-2016); 7.2% (tax year 2017); 7% (tax year 2018) and 6.9% (tax years 2019-2020). The 7.5% and 7% Cap rates provide a value of $372,480 (tax years 2014-2017) and $390,770 (tax years 2018-2020) using the EGI as computed by the Borough's appraiser ($27,936 tax years 2014-2017 and $27,354 for tax years 2018-2020).

With the above findings, the court finds the value of the Subject as follows:

**Tax Year 2014** (adjustments in italics)

|  | Subject | Sale 1[12] | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|---|
| Address | 100 Minue St Carteret | 902 E. Hazelwood Rahway | 7 Parkway Pl Edison | 1100 Milik St Carteret | 450 Florida Grove Perth Amboy |
| Sale Price | N/A | $2,200,000 | $3,780,500 | $3,650,000 | $2,650,000 |
| Sale Date | N/A | 04/10/2013 | 09/26/2011 | 03/18/2010 | 9/18/2009 |
| GBA | 28,800 SF | 29,996 SF | 50,400 SF | 49,776 SF | 39,141 SF |
| PSF GBA |  | $73.34 | $75.01 | $73.33 | $67.70 |
| Market Adj. |  |  | *+5%* | *+5%* | *+5%* |
| Adj. Price (AP) |  | $73.34 | *$78.76* | *$76.99* | *$71.09* |
| Lot Size | 5 acres | 1.38 acres | 2.42 acres | 4.41 acres | 2.7 acres |
| Doors/Bays | 21 bays | 3 truck doors; 1 bay *(+5% of AP)* | 4 indoor docks *(+5% of AP)* | 7 truck doors *(+5% of AP)* | 8 truck doors, 2 bays *(+5% of AP)* |
| Office Space | 11% | 15% | 5% *(-5% of AP)* | 15% | 15% |
| Condition/Age | Average | Average | Renovated *(-5% of AP)* | Good *(-5% of AP)* | Average |
| Final Adj Price |  | *$77.00* | *$75.42* | *$76.99* | *$74.64* |

Placing most weight to the Sale 1, its sale date being closest to the assessment date and its building size similar to the Subject; least weight to Sales 4 it being farthest from the assessment date; and more weight to Sale 3 it being in the Borough than Sale 2 which had a very motivated buyer, the court finds $76 PSF of GBA as reasonable, which provides a value of $2,188,800 (28,800 SF x $76 PSF). This plus $372,480 for the billboard provides the Subject's value as $2,561,280. The assessed-to-true value is 101% ($2,594,100 ÷ $2,561,800). The average ratio was 97.86% with the lower limit at 83.18% and upper limit at 112.5%. The assessed-to-true

---

[12] The sale was marked NU3 (sale between a corporation and its shareholder). The Borough's appraiser testified that he would deem it usable since the broker for the sale confirmed its arms-length nature.

value ratio exceeds the upper limit therefore, application of the average ratio is required, which reduces the assessment to $2,506,470 (rounded).

**Tax Year 2015** (adjustments in italics)

|  | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|---|
| Address | 100 Minue St Carteret | 7 Olsen Ave Edison | 902 E. Hazelwood Rahway | 7 Parkway Pl Edison | 1100 Milik St Carteret |
| Sale Price | N/A | $1,350,000 | $2,200,000 | $3,780,500 | $3,650,000 |
| Sale Date | N/A | 05/29/2014 | 04/10/2013 | 09/26/2011 | 03/18/2010 |
| GBA | 28,800 SF | 15,000 SF | 29,996 SF | 50,400 SF | 49,776 SF |
| PSF GBA |  | $90 | $73.34 | $75.01 | $73.33 |
| Market Adj. |  |  |  | *+5%* | *+5%* |
| Adj. Price (AP) |  | $90 | $73.34 | *$78.76* | *$76.99* |
| Lot Size | 5 acres | 2.11 acres | 1.38 acres | 2.42 acres | 4.41 acres |
| Doors/Bays | 21 bays | 2 bays *(+5% of AP)* | 3 truck doors; 1 bay *(+5% of AP)* | 4 indoor docks *(+5% of AP)* | 7 truck doors *(+5% of AP)* |
| Office Space | 11% | 12% | 15% | 5% *(-5% of AP)* | 15% |
| Condition/Age | Average |  | Average | Renovated *(-5% of AP)* | Good *(-5% of AP)* |
| Final Adj Price |  | *$94.50* | *$77.00* | *$75.01* | *$76.99* |

Placing equal weight to Sales 1 and 2 (closer to the assessment date), then to Sale 4 and last to Sale 3 (for the same reasons stated above since both were also used as comparables for tax year 2014), the court finds the reasonable PSF of GBA to be $85. This provides a value of $2,448,000 (28,800 SF x $85 PSF). This plus $372,480 for the billboard provides the Subject's value as $2,820,480. The assessed-to-true value is 91.97% ($2,594,100 ÷$2,820,480). The average ratio was 86.76% with the lower limit at 73.75% and upper limit at 99.77%. The assessed-to-true value ratio falls within the corridor therefore, the assessment is affirmed.

**Tax Year 2016** (adjustments in italics)[13]

|  | Subject | Sale 1 | Sale 3 | Sale 4 |
|---|---|---|---|---|
| Address | 100 Minue St Carteret | 6 Connerty Ct E. Brunswick | 7 Olsen Ave Edison | 902 E. Hazelwood Rahway |
| Sale Price | N/A | $1,450,000 | $1,350,000 | $2,200,000 |
| Sale Date | N/A | 09/29/2015 | 05/29/2014 | 04/10/2013 |
| GBA | 28,800 SF | 12,650 SF | 15,000 SF | 29,996 SF |
| PSF GBA |  | $114.62 | $90 | $73.74 |
| Market Adj. |  |  | *+5% of AP* | *+5% of AP* |
| Adj. Price (AP) |  | $114.62 | *$94.50* | *$77.01* |

---

[13] The court rejected comparable 2, the sale at 3001 S. Clinton Avenue, as it involved multiple lots.

| Lot Size | 5 acres | 2.04 acres | 2.11 acres | 1.38 acres |
|---|---|---|---|---|
| Doors/Bays | 21 bays | 16 loading docks; 5 bays | 2 bays *(+5% of AP)* | 3 truck doors; 1 bay *(+5% of AP)* |
| Office Space | 11% | 8% | 12% | 15% |
| Final Adj Price | | $114.62 | $99.23 | $77.43 |

Placing equal weight to the three sales (although Sale three has a more comparable GBA to the Subject, its assessment date is farther than Sales 1 and 2), the court finds $95 PSF of GBA as reasonable. This provides a value of $2,736,000 (28,800 SF x $95 PSF), which plus the billboard's valuation of $372,480 provides a total value of $3,108,480. The assessed-to-true value is 83.45% ($2,594,100 ÷ $3,108,480). The average ratio was 88.36% with the lower limit at 75.11% and upper limit at 101.61%. The assessed-to-true value ratio falls within the corridor therefore, the assessment is affirmed.

**Tax Year 2017** (adjustments in italics)[14]

| | Subject | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|
| Address | 100 Minue St Carteret | 3614 Kennedy Rd S. Plainfield | 11 Terminal Rd New Brunswick | 6 Connerty Ct E. Brunswick |
| Sale Price | N/A | $1,485,000 | $1,800,000 | $1,450,000 |
| Sale Date | N/A | 05/10/2016 | 04/22/2016 | 09/29/2015 |
| GBA | 28,800 SF | 15,435 SF | 19,500 SF | 12,650 SF |
| PSF GBA | | $96.21 | $92.31 | $114.62 |
| Market Adj. | | | | |
| Adj. Price (AP) | | $96.21 | $92.31 | $114.62 |
| Lot Size | 5 acres | 1.15 acres | 2.14 acres | 2.04 acres |
| Doors/Bays | 21 bays | 1 truck door; 2 bays *(+5% of AP)* | 4 loading docks *(+5% of AP)* | 16 loading docks; 5 bays |
| Office Space | 11% | 20% *(-5% of AP)* | 10% | 8% |
| Final Adj Price | | $96.21 | $99.23 | $114.62 |

Placing equal weight to the three sales, the court finds that $100 PSF of GBA is reasonable. This provides a value of $2,880,000 (28,800 SF x $100 PSF), which plus the billboard's valuation of $372,480 provides a total value of $3,252,480. The assessed-to-true value is 90.2% ($2,933,800 ÷ $3,252,480). Tax year 2017 was a district-wide reassessment year, therefore Chapter 123 does not apply, and an assessment cannot be increased unless a timely counterclaim was filed. <u>See</u>

---

[14] The court rejected comparable 1, the sale at 7 Progress Street, since it involved multiple lots.

Elrabie v. Borough of Franklin Lakes, 24 N.J. Tax 158 (Tax 2008). Since the Borough's counterclaim for tax year 2017 was withdrawn as untimely filed (and the court issued a judgment in this regard), the assessment is affirmed.

**Tax Year 2018** (adjustments in italics)[15]

|  | Subject | Sale 2[16] | Sale 3 | Sale 4 |
|---|---|---|---|---|
| Address | 100 Minue St Carteret | 15-19 Evans Terminal, Hillside | 3614 Kennedy Rd S. Plainfield | 11 Terminal Rd New Brunswick |
| Sale Price | N/A | $3,500,000 | $1,485,000 | $1,800,000 |
| Sale Date | N/A | 05/18/2017 | 05/10/2016 | 04/22/2016 |
| GBA | 28,800 SF | 32,189 SF | 15,435 SF | 19,500 SF |
| PSF GBA | | $108.73 | $96.21 | $92.31 |
| Market Adj. | | *+1%* | *+4%* | *+4%* |
| Adj. Price (AP) | | *$109.82* | *$100.06* | *$96* |
| Lot Size | 5 acres | 1.21 acres | 1.15 acres | 2.14 acres |
| Doors/Bays | 21 bays | | 1 truck door; 2 bays *(+5% of AP)* | 4 loading docks *(+5% of AP)* |
| Office Space | 11% | 12% | 20% *(-5% of AP)* | 10% |
| Condition/Age | Average | *(-5% of AP)*[17] | | |
| Final Adj Price | | *$104.32* | *$100.06* | *$100.08* |

Placing equal weight to the three sales, the court finds that $100 PSF of GBA is reasonable. This provides a value of $2,880,000 (28,800 SF x $100 PSF), which plus the billboard's valuation of $390,770 provides a total value of $3,270,770. The assessed-to-true value is 89.69% ($2,933,800 ÷ $3,270,770). The average ratio was 107.37% (i.e., 100%) with the lower limit at 91.26% and upper limit at 123.48%. The assessed-to-true value ratio falls below the lower limit, therefore the court therefore applies the average ratio, which is 100%, therefore, the assessment is increased to $3,270,770. See N.J.S.A. 54:51A-6(c) ("If both the average ratio and the ratio of the assessed value of the subject property to its true value exceed the county percentage level,

---

[15] The court rejected comparable 1, the sale at 333 Cantor Avenue, as a leased fee sale.
[16] The sale was marked NU26 because the seller was an exempt entity. Nothing was provided to show that the status of the seller renders the sale an unreliable indicator of value.
[17] The appraiser testified that this adjustment was for the age of the building.

the tax court shall enter judgment revising the taxable value of the property by applying the county percentage level to the true value of the property").[18]

**Tax Year 2019** (adjustments in italics)[19]

|  | Subject | Sale 1 | Sale 2 | Sale 4 |
|---|---|---|---|---|
| Address | 100 Minue St Carteret | 470 W. 1st Avenue Roselle | 10 Production Way, Avenel | 15-19 Evans Terminal, Hillside |
| Sale Price | N/A | $3,320,000 | $6,325,000 | $3,500,000 |
| Sale Date | N/A | 10/10/2018 | 11/29/2017 | 05/18/2017 |
| GBA | 28,800 SF | 32,293 SF | 54,866 SF | 32,189 SF |
| PSF GBA |  | $102.81 | $115.28 | $108.73 |
| Market Adj. |  |  | *+3%* | *+3%* |
| Adj. Price (AP) |  | $102.81 | *$118.74* | *$113.08* |
| Lot Size | 5 acres | 1.38 acres | 3.14 acres | 1.21 acres |
| Doors/Bays | 21 bays | 6 bay doors *(+5% of AP)* |  |  |
| Office Space | 11% | 6% |  | 12% |
| Condition/Age | Average | Average | Average | *(-5% of AP)* |
| Final Adj Price |  | *$107.95* | *$118.74* | *$107.43* |

Placing equal weight to the three sales, the court finds that $110 PSF of GBA is reasonable. This provides a value of $3,168,000 (28,800 SF x $110 PSF), which plus the billboard's valuation of $390,770 provides a total value of $3,558,770. The assessed-to-true value is 95.64% ($3,403,800 ÷ $3,558,770). The average ratio was 96.27% with the lower limit at 81.86% and upper limit at 110%. The assessed-to-true value ratio falls within the corridor, thus the assessment is affirmed.

**Tax Year 2020** (adjustments in italics)[20]

|  | Subject | Sale 2 | Sale 4 |
|---|---|---|---|
| Address | 100 Minue St Carteret | 27 Englehard Ave Woodbridge | 470 W. 1st Avenue Roselle |
| Sale Price | N/A | $3,700,000 | $3,320,000 |
| Sale Date | N/A | 05/28/2019 | 10/10/2018 |
| GBA | 28,800 SF | 25,351 SF | 32,293 SF |
| PSF GBA |  | $145.95 | $102.81 |
| Market Adj. |  | *+1%* | *+3%* |

[18] See Division of Taxation, Handbook for New Jersey Assessors, 684-85 (Oct. 2018) (at example 3, where the average ratio is 110.41%, the lower limit is 93.85%, the upper limit is 126.97%, the assessment is $120,000, the true value is found at $100,000, thus, the assessed-to-true value ratio is 110%, the court must apply the average ratio, i.e., 100% and conclude the value as $100,000).

[19] The court rejected comparable 3, the sale at 333 Cantor Avenue, as it was a leased fee sale.

[20] The court rejected comparable 1, the sale at 330 Dalziel Road, as it was a leased fee sale. It rejected comparable 3, 50 Ingham Avenue, since it involved multiple lots.

| | | | |
|---|---|---|---|
| Adj. Price (AP) | | *$147.41* | *$105.89* |
| Lot Size | 5 acres | 4.8 acres | 1.38 acres |
| Doors/Bays | 21 bays | 6 doors; 1 drive-in door *(+5% of AP)* | 6 bay doors *(+5% of AP)* |
| Office Space | 11% | 10% | 6% |
| Final Adj Price | | *$154.78* | *$111.18* |

Placing equal weight to each sale, the court finds $125 PSF of GBA is reasonable. This provides a value of $3,600,000 (28,800 SF x $125 PSF), which plus the billboard's valuation of $390,770 provides a total value of $3,990,770. The assessed-to-true value is 85.29% ($3,403,800 ÷ $3,990,770). The average ratio was 87.72% with the lower limit at 75.56% and upper limit at 100.8%. The assessed-to-true value ratio falls within the corridor therefore the assessment is affirmed.

**CONCLUSION**

The court finds the Subject's value for each tax year after application of the Chapter 123 ratio (except for tax year 2017) as follows: $2,506,470; $2,594,100; $2,594,100; $2,933,800; $3,270,770; $3,403,800; and $3,403,800. Judgements will be entered in accordance with this opinion.

Very Truly Yours,

Mala Sundar, P.J.T.C.